Rockingham
No. 2006-049

THE STATE OF NEW HAMPSHIRE

v.

JEFFREY PEPIN

Argued: February 7, 2007
Opinion Issued: October 16, 2007

*Kelly A. Ayotte*, attorney general (*Elizabeth A. Dunn*, assistant attorney general, on the brief and orally), for the State.

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for the defendant.

DALIANIS, J. The defendant, Jeffrey Pepin, appeals his conviction by a jury in Superior Court (*Nadeau*, J.) for first degree assault, second degree assault and criminal restraint. *See* RSA 631:1, :2 (2007); RSA 633:2 (2007). We affirm.

## I. Background

The jury could have found the following facts: The defendant and the victim were married in 1988, and have three daughters, the youngest of whom was born in March 2004. The instant criminal charges arose from events on October 15, 2004, the couple's sixteenth wedding anniversary. The victim was upset because she thought that the defendant had forgotten their anniversary. After the family ate dinner together, the defendant went to his home office to work. After a time, the victim went to the defendant's office to find out when he would be done and to tell him that she wanted to spend time with him. The defendant was meeting with his office manager. When the defendant said that he would be through in a few minutes, the victim left.

The defendant felt humiliated by the interruption. He left his office, came into the room where the victim was, and began swearing and yelling at her. The couple argued and the defendant eventually went upstairs to take a shower.

Because of the defendant's outburst, the victim felt nervous about staying in the house with him and decided to spend the night elsewhere with their baby. The couple's two older daughters were with the defendant's mother and stepfather. The victim packed a few things for the baby and started to gather items to launder. She began climbing the stairs to the laundry room when the defendant met her halfway and refused to let her pass. He held onto her and stood in her way so that she could not continue up the stairs. She tried to go around him, but he blocked her way and continued to hold onto her.

The victim started to panic and tried to go downstairs to phone for help. The defendant grabbed her by the arms and dragged her up the stairs saying, "[O]h no, you don't." After dragging her up to the landing of the

first stairway, he said, "I don't know why I even still bother with you, say good-bye," put his hands around her neck, and choked her. The victim tried to stop him, but soon lost consciousness. After she regained consciousness, the victim jumped up and tried to go downstairs, but the defendant stood in front of her and held her arms so that she could not get past him. The victim then attempted to go upstairs, but the defendant again held her arms from behind to prevent her from doing so. Suddenly, he stopped holding her from behind and started pushing her forward up the remaining stairs saying: "I've had it. I've f'ing had it, I might as well finish it and end it now, it's over for you bitch." When they reached the top of the stairs, the defendant grabbed her by the arm and the back of the head and slammed her face into the wooden floor four or five times. She was bleeding from her nose and in her mouth. He then choked her again and she again lost consciousness.

When the victim awoke, the defendant was crying and telling her that he loved her. The victim feigned unconsciousness, but after about ten minutes, she felt the urge to vomit, told the defendant this and crawled up the remaining stairs to the bathroom. She lay on the tile floor of the bathroom for a while because she felt weak. At some point, she crawled over to the toilet and vomited blood. Eventually, she walked into the bedroom and got into bed. She was so weak that she barely made it to the bed.

As she lay there, the victim decided that she would wait until the defendant was deeply asleep before trying to flee. She thought that if she tried to leave while he was still awake, he would try to hurt her again. She worried that if she tried to phone for help, he might kill her. She lay on top of the covers so that the cold air would keep her awake. The defendant eventually came to bed, put his arm around her and told her that he loved her. She pretended to fall asleep. She lay in bed from 9:30 or 9:45 p.m. until 4:00 a.m., waiting for the defendant to fall into a deep sleep. During that time, she struggled with whether to take the baby with her when she fled. She decided to leave without the baby, afraid that if she took the baby with her, the baby would cry and wake up the defendant and he would then beat her again.

At around 4:00 a.m., the victim began inching out of the bed. She moved one limb at a time off the bed, and after each move, waited to see if the defendant woke up. Eventually she was able to walk out of the bedroom and go down the stairs. She took her cell phone to call the police and left the house without a coat or shoes. She went to the garage, climbed into her car and started it, locking the doors to the car because she was afraid that the defendant might have followed her.

As she drove away, she called 911, frantic because she had left the baby in the house with the defendant and worried that he would hurt the baby when he realized that the victim had left. The dispatcher told her to drive to the parking lot of the local post office and wait for the police to arrive. The victim was afraid to stay there because she did not know whether the defendant had been following her. The dispatcher stayed on the line with her until the police arrived.

When the police arrived, the victim and dispatcher were still speaking; the victim was still frantic about having left her baby in the house. An officer noticed that the victim was crying and seemed to be "[v]ery nervous or afraid for her safety." He observed that her face had a lot of blood on it, some of which seemed fresh, and that it looked swollen. He also saw that she had a cut on her mouth and red marks on her neck "like if somebody put something around [it]." The victim told the officer what had happened that night. She also told the police that she had left her baby in the house because she was afraid that the baby would cry and wake up the defendant and that he would then beat her again. She told the police that she wanted her baby.

While the victim was taken by ambulance to the hospital, the police drove to her residence. After knocking on the door and getting no response, the police announced their presence and entered the home. The police eventually found the defendant in a third-floor crawlspace, lying face down. The defendant testified that he hid there because he "didn't want to be found."

In the meantime, the victim was treated at the hospital for a broken nose and lip laceration. A piece of a broken tooth that had been embedded in her lip was removed. She had a bruise on the left side of her neck. The treating physician testified that the victim's broken nose, broken tooth and swollen chin were consistent with being forcibly slammed against a floor. He also testified that the contusions on her neck were consistent with force having been applied there.

For about a week after the incident, the victim was unable to eat anything other than soft foods and could drink liquids only through a straw. Her injuries required her eventually to wear braces on her teeth; she also had to have a root canal because of her broken tooth. At the time of trial, nearly a year after the incident, the victim's lip was still tender, numb and tingling, and she had a scar underneath it.

A grand jury indicted the defendant for two counts of attempted murder and one count each of first degree assault, second degree assault and criminal restraint. The jury acquitted him on the attempted murder charges and convicted him on the remaining charges. This appeal followed.

## II. Defendant's Appellate Arguments

### A. 911 Call

The defendant first argues that the trial court erred when it permitted the jury to hear a tape of the victim's 911 call. He contends that the trial court erroneously ruled that the tape satisfied the excited utterance exception to the hearsay rule.

We review a trial court's decision to admit evidence under our unsustainable exercise of discretion standard. *State v. Jordan,* 148 N.H. 115, 117 (2002). To meet this standard, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case. *Id.*

The excited utterance exception to the hearsay rule permits the admission of hearsay statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." N.H. R. Ev. 803(2). To qualify as an excited utterance, the statement "must be a spontaneous verbal reaction to some startling or shocking event, made at a time when the speaker was still in a state of nervous excitement produced by that event and before [s]he had time to contrive or misrepresent." *State v. Gordon,* 148 N.H. 710, 720 (2002) (quotation omitted). "The basis of the excited utterance exception rests with the spontaneity and impulsiveness of the statement; thus, the startling event does not have to be the actual crime itself, but rather may be a related occurrence that causes such a reaction." *State v. Bean,* 153 N.H. 380, 386 (2006) (quotation omitted).

Here, the trial court reasonably could have found that the victim's statements in the 911 call were excited utterances. The record supports a finding that the victim made these statements immediately upon sneaking out of the house to flee the defendant who had beaten her severely that evening. It also supports the trial court's finding that the events that caused the victim extreme emotional upset were not only the beating, but also the decision to leave her baby behind when she fled. It further supports the trial court's finding that, on the tape, the victim was "still clearly upset and out of control and hysterical." In light of these findings, which the record supports, we conclude that the trial court did not unsustainably exercise its discretion by ruling that the victim's statements on the 911 call were excited utterances.

The defendant contends that the statements could not be excited utterances because the victim made them several hours after the beating stopped. "The timing of the statement is only a factor to be considered,"

however. *MacDonald v. B.M.D. Golf Assocs.*, 148 N.H. 582, 585 (2002). More importantly, "there is no requirement that the crime be the startling event." *Bean*, 153 N.H. at 385. In this case, the victim was still under the stress of excitement caused by the beating, her flight from the defendant and her decision to leave her baby behind, and these were the "startling or shocking" events giving rise to her statements on the 911 call.

The defendant also asserts that permitting the jury to hear the tape was error because the tape was more prejudicial than probative. *See* N.H. R. Ev. 403. We decline to address this argument because the defendant has failed to demonstrate that he preserved it for our review.

In general, a defendant must make a specific and contemporaneous objection during trial to preserve an issue for appellate review. *State v. Hoag*, 145 N.H. 47, 52 (2000). A motion *in limine* is sufficient to preserve an issue for appeal without an objection at trial if the trial court definitively rules on the issue before trial. *Id.*

█ In his motion *in limine*, the defendant specifically objected to admission of the 911 tape on the ground that the victim's statements were not excited utterances, but did not mention New Hampshire Rule of Evidence 403's balancing of probative and prejudicial effect. *See State v. Croft*, 142 N.H. 76, 80 (1997). Nor did he raise Rule 403 when arguing his motion to the trial court. He also did not mention balancing probative and prejudicial effect under Rule 403 when the trial court issued its ruling on his motion *in limine*. Under these circumstances, we hold that the defendant failed to preserve his argument that allowing the jury to hear the 911 tape was more prejudicial than probative. *See id.* We therefore decline to address it.

### B. May 2004 Threat

#### 1. Background

The defendant next asserts that the trial court erred by admitting evidence of a threat he made to the victim in May 2004, approximately five months before the events at issue. According to the victim, the defendant threatened her when she caught him on the phone with a woman with whom she suspected him of having an affair. When she confronted him, the defendant told the victim: "[I]f you ... let [the woman's husband] know, then I'll put a gun to your head and shoot and kill you." The victim testified that, at a marital counseling session a few weeks later, the counselor questioned the defendant about the incident and "he said I think anyone's capable of doing anything if their right buttons are pushed." The parties' marital counselor also testified to this. Because of this incident, the

defendant was eventually charged with misdemeanor criminal threatening, to which he pled *nolo contendere.*

Before trial, the State moved *in limine* to admit the above evidence, and the defendant moved *in limine* to exclude it. In its pretrial order, the court ruled that it would admit evidence of the threat as well as the defendant's statement to the marriage counselor, but would not admit evidence of the criminal threatening charge and conviction. The trial court revisited this decision during the parties' opening statements, when defense counsel, over the State's objection, told the jury that the husband of the woman with whom the victim suspected the defendant of having an affair threatened to shoot the defendant in the head. Defense counsel explained to the court that the defendant was going to testify that he did not threaten the victim in May 2004, but was merely relating the threat that the husband of his alleged paramour had issued to him. The State argued that, given this anticipated testimony, the court should allow it to introduce evidence of the defendant's conviction for misdemeanor criminal threatening. The trial court took this under advisement and then, after the defendant testified on direct, permitted the State on cross-examination to elicit testimony about the conviction.

At the defendant's request, the trial court specifically instructed the jury about the May 2004 threat as follows:

> Now, you've heard evidence in this case that the defendant allegedly had threatened [the victim] in May of 2004. It is for you to decide from the evidence presented whether or not this threat was in fact made. If you find a threat was made, you may only consider the threat for a specific purpose. And I'm going to tell you right now. You may not consider the threat as evidence of the defendant's general character or as evidence that because the defendant threatened the alleged victim, he must have therefore committed the crimes on October 15, 2004.
>
> You may, however, consider evidence of the threat as tending to show whether or not the defendant had the specific intent to kill or assault [the victim] on October 15, 2004.

### 2. Rule 404(b)

The defendant argues that admitting evidence of the May 2004 threat violated Rule 404(b). We review the trial court's admission of evidence pursuant to Rule 404(b) for an unsustainable exercise of discretion. *State v. Sawtell*, 152 N.H. 177, 181 (2005). Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person

acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

N.H. R. Ev. 404(b). Evidence of other crimes is inadmissible unless: "(1) it is relevant for a purpose other than to show the defendant's bad character or disposition; (2) there is clear proof that the defendant committed the other crimes or acts; and (3) prejudice to the defendant does not substantially outweigh the probative value of the evidence." *Sawtell*, 152 N.H. at 182.

The defendant argues that the prior threat was relevant solely to show his propensity to commit violence. We hold that, to the contrary, the record supports the trial court's determination that the May 2004 threat was relevant to the defendant's intent on October 15, 2004.

■ "To be relevant to intent, evidence of other bad acts must be able to support a reliable inference, not dependent on the defendant's character or propensity, that the defendant had the same intent on the occasions of the charged and uncharged acts." *State v. Bassett*, 139 N.H. 493, 499 (1995). "We will find sufficient support for a reliable inference of intent only if the defendant's intent in committing other bad acts and the defendant's intent in the charged offenses is closely connected by logically significant factors." *Id.*

In *State v. Richardson*, 138 N.H. 162, 163 (1993), for instance, the defendant was convicted of, among other things, simple assault. Over the defendant's objection, the trial court admitted evidence of his prior threats and violent behavior towards the victim. *Richardson*, 138 N.H. at 164. We found that this prior bad act evidence "was relevant to and probative of his intent towards [the victim] and her own state of mind at the time of the charged offenses." *Id.* at 166. Although it may also have demonstrated his propensity for violence, the prior bad act evidence "was relevant to his intent to act towards this particular victim in an intimidating manner." *Id.* The prior bad act evidence "made it more probable than not that the defendant on the later occasion acted with an intent to terrorize [the victim] and that those actions placed her in fear for her physical safety." *Id.; see State v. Brewster*, 147 N.H. 645, 649-50 (2002) (prior threats against victim admissible to prove harassment and criminal threatening charges because probative of defendant's motive and intent and of victim's state of mind); *State v. Simonds*, 135 N.H. 203, 207 (1991) (prior sexual contact with victim is admissible to show intent to touch this victim for sexual gratification).

The defendant in *Sawtell*, 152 N.H. at 178, was convicted of first degree murder. In that case, we ruled that evidence of his prior threats to the victim with a gun were relevant to prove his intent because the prior conduct involved the same parties, similar if not identical weapons and occurred under similar circumstances. *Sawtell*, 152 N.H. at 182; *see State v. Dukette*, 145 N.H. 226, 230-31 (2000).

In the instant appeal, the trial court found, and the record supports, that the May 2004 threat was relevant to the defendant's intent to commit the charged crimes. The defendant was charged with, among other crimes, attempted murder and first degree assault. The attempted murder charges required proof that he acted with the purpose to cause the victim's death. *See State v. Brown*, 128 N.H. 606, 614 (1986). The first degree assault charge required proof that he "[p]urposely caused serious bodily injury to another." RSA 631:1, I(a). "A person acts purposely with respect to a material element of an offense when his conscious object is to cause the result or engage in the conduct that comprises the element." RSA 626:2, II(a) (2007).

█ As the trial court found, and as the record supports, the May 2004 threat and these charged offenses were closely connected by logically significant factors. *See Bassett*, 139 N.H. at 499. As in *Richardson* and *Sawtell*, the prior threat in this case was directed at the same victim and in a similar context as the charged offenses; *i.e.*, his efforts to intimidate the victim when she did something he disliked. Moreover, the May 2004 threat showed the defendant's specific intent to kill the victim approximately five months before the charged offenses occurred. Proof of this threat, therefore, made it more probable than not that when the defendant said to the victim, "I've had it. I've f'ing had it, I might as well finish it and end it now, it's over for you bitch," and then assaulted her in October 2004, he did so with a purpose to cause her death, or at the very least, to cause her serious bodily injury. The evidence of the May 2004 threat was not admissible to show the defendant's propensity for violence, but to demonstrate that when he acted violently in October 2004, he did so with the purpose of causing the victim's death or at least serious bodily injury.

The defendant concedes that "[p]rior threats are admissible to prove the defendant's intent ... when their probative value outweighs their prejudicial effect." He implies, however, that the probative value of the May 2004 evidence did not substantially outweigh the danger of unfair prejudice to him.

"We accord considerable deference to the trial court's determination in balancing prejudice and probative worth of evidence under Rule 404(b)." *Brewster*, 147 N.H. at 650 (quotation omitted). Particularly pertinent to

determining this balance is whether the evidence is relevant to prove an issue that is actually in serious dispute. *Id.* "When intent is not conceded by the defense, and it is an element of the crime to be proven by the State, it is sufficiently at issue to require evidence at trial." *Id.* (quotation and brackets omitted).

██ The record supports the trial court's determination that the probative value of the evidence was not substantially outweighed by its prejudicial effect. As noted above, the May 2004 threat was probative of the defendant's intent. "Further, because the issue of the defendant's intent was central to the trial of this matter, the probative value was significant." *State v. Ayer,* 154 N.H. 500, 513 (2006), *cert. denied,* 128 S. Ct. 63 (2007). The prejudicial impact to the defendant was limited; the trial court "admitted the evidence for the sole purpose of determining the defendant's intent and so instructed the jury." *Id.* Because we assume that the jury is presumed to follow the trial court's instructions, any prejudice from admitting evidence of the May 2004 threat was slight. *Id.* For all of the above reasons, therefore, we hold that the trial court did not unsustainably exercise its discretion when it admitted evidence of the May 2004 threat.

### *3. Rule 609(a)*

The defendant next contends that the trial court erred by permitting the State to introduce on cross-examination evidence that he pled *nolo contendere* to the criminal threatening charge. He asserts that this violated Rule 609(a). *See* N.H. R. Ev. 609(a). We decline to address this argument because the defendant has failed to demonstrate that he preserved it for our review. While the record demonstrates that the defendant objected based upon Rule 404(b), it does not reflect that he did so based upon Rule 609(a). *See Croft,* 142 N.H. at 80.

### *C. Testimony of Marital Counselor*

The defendant next argues that the trial court erred when it allowed the couple's marriage counselor to testify about his statements concerning the May 2004 threat. He asserts that permitting the counselor to testify violated the counselor-client privilege under Rule 503(b). *See* N.H. R. Ev. 503(b).

Having reviewed the record submitted on appeal, we conclude that the defendant has failed to demonstrate that he preserved this issue for our review. On the second day of trial, the victim testified that she brought up the May 2004 threat at a counseling session. She testified that when the counselor questioned the defendant about it, "he said I think anyone's

capable of doing anything if their right buttons are pushed." The defendant failed to object to this testimony.

The following day, after the State informed the court that it intended to call the counselor to testify about the same statement, the counselor's attorney raised concerns about the counselor-client privilege. Defense counsel did not. While defense counsel may have raised issues related to the counselor-client privilege at a bench conference to which the transcript alludes, the conference was unrecorded. Under these circumstances, therefore, we conclude that the defendant has failed to demonstrate that he argued to the trial court that the counselor's testimony violated the counselor-client privilege.

### D. Sufficiency of Evidence

The defendant next asserts that the evidence was insufficient to convict him of either criminal restraint or first degree assault. In a challenge to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found guilt beyond a reasonable doubt. *State v. Sweeney*, 151 N.H. 666, 673 (2005). We examine each evidentiary item in the context of all of the evidence, not in isolation. *Id.* When the evidence is solely circumstantial, it must exclude all rational conclusions except guilt. *State v. Evans*, 150 N.H. 416, 424 (2003). Under this standard, however, we still consider the evidence in the light most favorable to the State and examine each evidentiary item in context, not in isolation. *Id.*

### 1. Criminal Restraint

To convict the defendant of criminal restraint, the State had to prove, beyond a reasonable doubt, that: (1) the defendant unlawfully confined the victim; (2) the circumstances of the confinement exposed the victim to a risk of serious bodily injury; and (3) the defendant acted knowingly. *See* RSA 633:2, I. Unlawful confinement "includes but is not limited to confinement accomplished by force, threat or deception." RSA 633:2, II. Serious bodily injury "means any harm to the body which causes severe, permanent or protracted loss of or impairment to the health or of the function of any part of the body." RSA 625:11, VI (2007). To prove that the defendant acted knowingly, the State had to show that he was aware that his conduct would cause unlawful confinement. *See* RSA 626:2, II(b) (2007).

Considering all of the evidence and the inferences to be drawn from it in the light most favorable to the State, we conclude that it was sufficient for a rational juror to find, beyond a reasonable doubt, that the defendant was guilty of criminal restraint. The jury heard evidence that the

defendant repeatedly stopped the victim from going upstairs or downstairs by holding onto her arms, standing in front of her, and physically restricting her movement. The jury also heard evidence that, before the first choking incident, the defendant dragged the victim upstairs when she was trying to go downstairs, and that before the second choking incident, he pushed her upstairs when she was trying to go downstairs. Viewing this evidence in the light most favorable to the State, a rational juror could have found that the defendant knowingly and unlawfully confined the victim.

Additionally, the jury heard evidence that the defendant twice choked the victim until she lost consciousness and slammed her face into the floor four or five times, breaking her nose, breaking a tooth, and cutting her lip. This evidence was more than sufficient for a rational juror to find, beyond a reasonable doubt, that the circumstances of the confinement exposed the victim to the risk of serious bodily injury.

Viewing this evidence and all inferences to be drawn from it in the light most favorable to the State, we hold that a rational juror could have found beyond a reasonable doubt that the defendant committed the crime of criminal restraint.

### 2. First Degree Assault

To convict the defendant of first degree assault, the State had to prove, beyond a reasonable doubt, that: (1) the defendant caused serious bodily injury to the victim; and (2) he acted purposely. *See* RSA 631:1. To show that he acted purposely, the State had to prove that he had the conscious object to cause serious bodily injury to the victim. *See* RSA 626:2, II(a). As explained previously, serious bodily injury "means any harm to the body which causes severe, permanent or protracted loss of or impairment to the health or of the function of any part of the body." RSA 625:11, VI.

 The defendant contends that the evidence was insufficient to support a finding that he caused serious bodily injury to the victim. We disagree. The jury heard evidence that the victim suffered a broken nose, a broken tooth and a lacerated lip. Her neck was bruised and her chin was swollen. For about a week after the incident, she was unable to drink, except through a straw, and unable to eat anything other than soft foods. The jury also heard testimony that, because of the beating, the victim had to have a root canal and, eventually braces, and that, at the time of trial, nearly a year later, her lip was still tender, numb and tingling. Viewing this evidence and all inferences to be drawn from it in the light most favorable to the State, we hold that a rational juror could have found, beyond a reasonable doubt, that the defendant caused the victim to suffer

serious bodily injury. *See State v. Scognamiglio*, 150 N.H. 534, 537 (2004) (broken nose, swollen discolored eyes, clogged breathing passages and sinus infection constitute serious bodily injury); *State v. MacArthur*, 138 N.H. 597, 598, 600 (1994) (victim suffered serious bodily injury where she sustained severe facial lacerations, hemorrhage in right eye and a swollen and bruised face).

### E. Suppression

Finally, the defendant argues that the trial court erred by failing to suppress evidence that the police found him lying down in a third-floor crawl space. He contends that evidence about his location in the house constituted the fruit of an unlawful search.

The record on appeal does not demonstrate, however, that the defendant ever moved to suppress this evidence. Nor does it reveal that he ever objected at trial to its admission. Accordingly, the defendant has not preserved this issue for our review. We therefore decline to review it. Nor are we persuaded by the defendant's argument that admission of the evidence constitutes plain error. *See* SUP. CT. R. 16-A.

*Affirmed.*

BRODERICK, C.J., and DUGGAN and GALWAY, JJ., concurred.