NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

————————————————

Coos
Nos. 2014-0112
        2014-0743


THE STATE OF NEW HAMPSHIRE

v.

SAMUEL PENNOCK

Argued:  September 16, 2015
Opinion Issued:  October 27, 2015


        Joseph A. Foster, attorney general (Nicholas Cort, assistant attorney general, on the brief and orally), for the State.


        Stephanie Hausman, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.


        DALIANIS, C.J.  In these consolidated appeals, the defendant, Samuel Pennock, appeals his conviction by a jury of felony simple assault, see RSA 631:2-a (2007); RSA 173-B:9, IV (2014), and the denial by the Superior Court (Bornstein, J.) of his post-conviction motion to vacate his sentence and for a new trial.  On appeal, he argues that the trial court erred by:  (1) substantively admitting the victim's pretrial oral and written statements under the excited utterance exception to the hearsay rule, see N.H. R. Ev. 803(2); (2) denying his motion to dismiss the simple assault charge; (3) denying his post-conviction motion to reduce that charge to a class B misdemeanor and to resentence him

accordingly; and (4) denying his post-conviction motion for a new trial based upon newly discovered evidence. We affirm.

On July 29, 2013, a grand jury indicted the defendant on three charges: (1) simple assault as a class B felony, see RSA 631:2-a; RSA 173-B:9, IV; (2) second degree assault as a class A felony, see RSA 631:2, I(f) (Supp. 2014); RSA 173-B:9, IV; and (3) criminal mischief as a class B felony, see RSA 634:2, III (2007); RSA 173-B:9, IV. The charges all stemmed from an incident that occurred on or about July 9, 2013. The indictments alleged that, on or about July 9, the defendant pushed and strangled his wife and kicked her vehicle. Following a January 2014 jury trial, the defendant was acquitted of all but the simple assault charge. In February 2014, the trial court sentenced him to 12 months in the house of corrections, stand committed, with nine months of the sentence suspended for two years. The court also placed the defendant on probation for two years following his release from the house of corrections.

In October 2014, while his appeal of the simple assault conviction was pending, the defendant filed in the trial court a motion to vacate, set aside, or correct his illegal sentence "based on a statutory error and . . . on newly discovered evidence." We stayed further processing of the appeal so that the trial court could address the motion. The trial court denied the motion and the defendant's subsequent motions for reconsideration. We later consolidated the defendant's appeal of the trial court's denial of his post-conviction motion with his direct appeal of his conviction. We first address the defendant's direct appeal.

I. Excited Utterance

The defendant first argues that the trial court erred by admitting substantively the victim's pretrial statements to a police officer under the excited utterance exception to the hearsay rule. See N.H. R. Ev. 803(2).

A. Relevant Facts

The victim testified that the July 9 incident was prompted by her telephone call to the defendant at approximately 2:30 a.m. asking him to return home. When he did so approximately 20 minutes later, the defendant told the victim that she had been rude. The defendant went upstairs, and the victim stayed downstairs on the couch.

The next morning, the defendant again told the victim that she had been rude. When the victim apologized, the defendant asked her to leave the house. Although the victim wanted the defendant to talk with her, he refused. At one point, when the defendant attempted to make a telephone call, she "grabbed the phone" before he could do so, and later she "pulled the phone cord out of the wall."

The victim further testified that the defendant wanted to leave, but that she had hidden the car keys and refused to give them to him. She also "block[ed] [the defendant] from leaving the house." Subsequently, the defendant "grabbed [her] arms," and she "bit him." The defendant then "pushed [her] away from him," and she "dropped to the ground and started crying." The two "started arguing some more," but, eventually, the victim "let [the defendant] leave." When she could no longer see the defendant from the kitchen window, the victim "went and grabbed the keys from where [she] had hidden them and packed up the children and . . . [the] dog, and . . . left." The victim drove to the homes of two local friends, but, seeing no car in either driveway, she drove to the police station. The victim testified that she was crying when she drove to her friends' homes and that she was still crying and upset when she arrived at the police station.

The victim "sat outside the police station in the car for about ten minutes," still upset "[f]rom the argument" with the defendant. Still crying, she entered the police station, where she was greeted by Officer Nessa Platt. According to the victim, she "didn't want to say anything" to Platt, but Platt told the victim that she could see that the victim was "obviously upset," and asked her to explain what had happened. When the victim explained that her children and dog were in the car, Platt told her to "[b]ring them in," and "persisted that [the victim] come in [to the police station] and tell her what happened." The victim then told Platt about the incident, testifying that, while she spoke with Platt, she was "very upset" and "scared."

During the victim's direct examination, the State introduced into evidence photographs that she agreed accurately and fairly represented her appearance upon arriving at the police station. The State also sought to introduce her oral and written statements to Platt under the excited utterance exception to the hearsay rule. Over the defendant's objection, the trial court granted the State's request, observing that "[t]he [victim] [had] testified several times . . . that when she went [to the police station], when she spoke to the officer, she was still upset, she was still crying, she was visibly upset." The court stated that in the photographs admitted into evidence, the victim appeared "extremely disheveled, obviously distraught and obviously upset."

After this ruling, the victim testified that the first thing that she said to Platt was, "Nessa, Sam did it." She also testified that after she tried to apologize to the defendant, he called her names. She further admitted that the defendant put his hand in front of her face and that she pushed it away. However, she denied telling Platt that the defendant had grabbed her and had thrown her against the wall, that he had pushed her into the kitchen sink, or that, when she had pushed him off her, he then had put his arms around her neck. She also denied telling Platt that she had bitten the defendant to get him off her and that he had responded by grabbing her around the neck and pushing her to the ground.

3

The victim then read the following portion of the written statement she made at the police station:

> I tried to say sorry to [the defendant] for being rude and grumpy the night before, and he started being hurtful, calling me names, and I was stupid and I was a liar, and told me to leave him alone, so I went to the kitchen and started cleaning. He followed me and continued to yell and call me names. He got close to my face and held his hand in front of my face, and I pushed it away, and he grabbed me and threw me into the wall and I got up and swung my hand around and said, "Don't touch me." He then pushed me into the kitchen sink, and I tried pushing him off. He had his arm around my neck, so I bit him to get him off, and he grabbed my neck and pushed me to the ground and then held me down on the ground and was yelling in my face. When he left I got the kids in the car and saw him walking back towards the house, and I tried talking to him again and he kicked my car.

Subsequently, the victim read to the jury another written statement:

> I tried to apologize to [the defendant] for being grumpy, and he started yelling at me, calling me names like c[**]t, b[***]h, stupid and fat cow, and told me he wasn't accepting my apology and to leave him alone. So I went in the kitchen and started cleaning. He followed and continued arguing with me and calling me names. I gave him no response until he put his hand in my face, and I pushed it away and told him to keep his hands away from me. He then grabbed my arm and threw me into the den wall. When I got up I swung my hand around, which caught his arm. I said, "Don't touch me." He then grabbed me by my shirt on the collar and pushed me backwards until I hit the counter. Meanwhile I was trying to push him off me. He grabbed with his arm around my neck, so I bit him to get away. He then grabbed me by the throat, and I tried telling him he was choking me. I fell to the floor, where he restrained me by my arms and legs. When I got up he continued to call me the same names. He eventually left the house after breaking the phone in half and punching a hole in the wall. I got my two daughters and two dogs in the car and I was leaving when I saw him coming up the road where I tried to talk to him again, and he kicked a dirty mud puddle of water and dirt at the car, and it covered my face.

This second written statement was part of the victim's July 9 application for a domestic violence order of protection. It was not admitted into evidence substantively, but, instead, was admitted as a prior inconsistent statement.

4

On cross-examination, the victim again confirmed that the defendant pushed her, but denied that he strangled or choked her or put his hands or arms around her neck so that she could not breathe. She also testified that she bit the defendant when he tried to restrain her, and "that the argument . . . turned physical when [she] pushed [the defendant's] hand into his face." She testified that she attempted to prevent the defendant from using the phone because she "didn't want him to call the police." The victim testified that she was afraid that, if he did so, the State would "take [her] children."

Platt also testified about the victim's pretrial statements. Platt testified that when the victim arrived at the police station, "[s]he was very upset and crying[,] . . . [s]he was shaking," and that when the victim spoke with her, the victim's "voice was filled with emotion." Platt testified that the victim's first words to her were: "Sam did it." When Platt asked what had happened, the victim told her "that she and [the defendant] had gotten into an argument . . . , she attempted to apologize and that he became upset with her and started to yell at her and call her names." The victim said that the defendant followed her into the kitchen, where he continued to yell, and then put his hand in front of her face. When she attempted to push the defendant's hand away, the defendant "threw her against the wall and . . . wrapped his arm around her neck." "[S]he bit him to get him away from her," and the defendant "then pushed her down onto the ground and . . . wrapped his hand around her neck and applied pressure." Platt confirmed that the photographs are "a fair and accurate representation of what [the victim] looked like on July 9th." Platt testified that, with regard to the written statement, the victim wrote it while "[s]he was still upset" and "was crying the entire time."

### B. Appellate Arguments

On appeal, the defendant argues that the victim's oral and written statements to Platt constitute hearsay. He asserts that they "were not excited utterances" because: (1) they were made "after [the victim] had an opportunity to contrive or misrepresent"; (2) the victim "did not volunteer her statements"; and (3) the victim "had a motive to not tell Platt everything that had happened." He further contends that even if the oral statements were admissible, the written statement was not. He observes that we have "never found a written statement to be an excited utterance, because the act of composing one's thoughts in order to write about them in an organized fashion is the antithesis of a spontaneous utterance while made under the stress of a startling event."

### C. Analysis

The excited utterance exception to the hearsay rule permits the admission of hearsay statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." N.H. R. Ev. 803(2). "To qualify as an excited utterance,

5

the statement must be a spontaneous verbal reaction to some startling or shocking event, made at a time when the speaker was still in a state of nervous excitement produced by that event and before [s]he had time to contrive or misrepresent." State v. Pepin, 156 N.H. 269, 274 (2008) (quotation omitted). "The basis of the excited utterance exception rests with the spontaneity and impulsiveness of the statement . . . ." Id. (quotation omitted).

Whether testimony is admissible as an exception to the hearsay rule is for the trial court to determine. State v. Beltran, 153 N.H. 643, 650 (2006). We will not disturb its determination unless we find it to be an unsustainable exercise of discretion. Id. "[O]ur task is not to determine whether we would have found differently . . . ." In re Adam M., 148 N.H. 83, 84 (2002). "Our only function on review is to determine whether a reasonable person could have reached the same decision as the trial court on the basis of the evidence before it." State v. Field, 132 N.H. 760, 767 (1990) (quotation and brackets omitted). "In determining whether a ruling is a proper exercise of judicial discretion, we consider whether the record establishes an objective basis sufficient to sustain the discretionary decision made." State v. Furgal, 164 N.H. 430, 438 (2012) (quotation omitted). To show an unsustainable exercise of discretion, "the defendant must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case." Id. (quotation omitted).

We hold that the trial court did not unsustainably exercise its discretion when it admitted the victim's oral statements under the excited utterance exception to the hearsay rule. To the extent that the trial court erred by admitting the victim's written statement under that exception, we conclude that, as the State argues, any error was harmless beyond a reasonable doubt.

### 1. Oral Statements

The defendant first contends that the victim's oral statements are not excited utterances because she made them after she had time to "fabricate." "The precise amount of time that may elapse before a statement loses its spontaneity as an excited utterance evoked by a startling event and becomes a mere narrative cannot be established by any absolute rule of law and accordingly, much must be left to the discretion of the trial court in admitting or rejecting such testimony." State v. Martineau, 114 N.H. 552, 557 (1974) (quotation and brackets omitted).

The defendant argues that the time it took the victim to watch the defendant "walk out of sight, retrieve[ ] her keys . . . , gather[ ] the two children and the dog," drive past her friends' homes, drive to the police station, and then sit in her car for 10 minutes "showed that [she] was not so upset by the incident as to be incapable of considering her options." Based upon the record before us, however, we cannot say, as a matter of law, that "there was simply too much time for reflective thought." State v. Woods, 130 N.H. 721, 726

(1988); compare id. at 726-27 (child victim's statement to mother the day after the assault was not an excited utterance), State v. Fischer, 165 N.H. 706, 709-11 (2013) (victim's detailed narrative of assaults, given the day after assaults occurred and after she went to the hospital for treatment and to work, did not constitute an excited utterance), and State v. Thompson, 161 N.H. 507, 532 (2011) (explaining that "the admissibility of statements made five days following a startling event runs directly contrary to our . . . case law"), with Pepin, 156 N.H. at 274-75 (victim's 911 call, made several hours after the defendant stopped beating her, constituted excited utterance), State v. Bonalumi, 127 N.H. 485, 489 (1985) (wife's statement made within an hour of her husband's arrest constituted an excited utterance), State v. Plummer, 117 N.H. 320, 325 (1977) (statement constituted an excited utterance when given more than three hours after startling event).

We find Pepin instructive. In that case, the defendant beat the victim severely. Pepin, 156 N.H. at 271-72. Afterwards, the victim lay in bed next to him for over six hours, contemplating how best to flee and whether to take her baby with her. Id. at 272. Eventually, she decided to leave without her baby, afraid that if she took the baby, the baby would cry and wake the defendant and he would then beat her again. Id. At 4:00 a.m., the victim began inching her way out of the bed. Id. When she was finally able to walk out of the bedroom, she went downstairs, took her cell phone, entered the garage, climbed into her car, started it, locked the doors, drove, and called 911. Id. at 272-73. We rejected the defendant's argument that the victim's 911 call could not be an excited utterance because she made the call several hours after the beating stopped. Id. at 274-75. We explained, "The timing of the statement is only a factor to be considered." Id. at 274 (quotation omitted). We held that the statements constituted excited utterances because "the victim was still under the stress of excitement caused by the beating, her flight from the defendant and her decision to leave her baby behind, and these were the 'startling or shocking' events giving rise to her statements on the 911 call." Id. at 275; see Woods, 130 N.H. at 727 ("Although this requirement of temporal proximity is designed to foreclose any opportunity for the declarant to contrive or misrepresent the facts, a delayed statement may still have had its source in such continuing excitement that spontaneity exists[ ] sufficient to justify a departure from requiring strict contemporaneity." (quotation and citations omitted)).

Similarly, in this case, the trial court reasonably could have found that the victim was still under the stress of excitement caused by the physical altercation with the defendant and her flight from the house and that those "startling or shocking" events gave rise to her statements to Platt. Both the victim and Platt testified that, when they spoke, the victim was crying and very upset. Platt testified that the victim was "shaking," and that her "voice was filled with emotion," which shows that she remained upset by the physical altercation with the defendant. See MacDonald v. B.M.D. Golf Assocs., 148

7

N.H. 582, 585 (2002). The photographs further support the finding. As the trial court found, they "depict [the victim] as extremely disheveled, obviously distraught and obviously upset." See State v. Gordon, 148 N.H. 710, 720 (2002) (rejecting defendant's argument that victim's statement was not an excited utterance because it was made after she had had time to reflect when statement was made only minutes after startling event, while victim was "upset, trembling, shaking, and crying").

The defendant next argues that the statements are not excited utterances because they were made in response to Platt's questions. "The fact that an . . . utterance is made in response to a question does not necessarily bar its admission as an excited utterance." State v. Kenna, 117 N.H. 305, 308 (1977). It is but one factor to be considered. See id.; see also MacDonald, 148 N.H. at 585 (explaining "[t]hat the declarant may have been responding to a question does not prevent his statement from being spontaneous"). Moreover, the trial court reasonably could have found that the victim spontaneously responded to a general question by Platt and that her response was made while still under the stress of the physical altercation with the defendant. See State v. Hudson, 121 N.H. 6, 10-11 (1981) (upholding trial court's determination that victim's statement constituted an excited utterance even though it was made ten minutes after the startling event and was made in response to his father's question).

We disagree with the defendant that the victim's pretrial statements are similar to those in Cole. See State v. Cole, 139 N.H. 246, 249-50 (1994). In Cole, the declarant was a passenger in a vehicle driven by the defendant. Id. at 248. When a police officer saw the vehicle speeding, he signaled the vehicle to pull over, and when it did not stop, a chase ensued. Id. Eventually, the car crashed into an embankment alongside the road. Id. The officer stopped his cruiser beside the vehicle and saw the declarant exiting through the passenger door. Id. Footprints led the police from the driver's side of the vehicle to the top of the embankment, where the police arrested the defendant. Id.

At trial, the State offered the officer's testimony that the declarant had told him, "Hey, man, I didn't drive the car. It was the other guy." Id. (quotation omitted). We explained that when exculpatory statements are "made in response to direct charges of fault," they are considered to be deliberate, "not reflexive." Id. at 249. We concluded that, because the declarant's statement came "on the heels of [the declarant's] involvement in illegal activity, the officer's approach betokened an impending accusation." Id. Thus, we reasoned, the declarant's statement "was not spontaneous, but was designed to exonerate himself from a charge of disobeying a police officer," and, thus, was not an excited utterance. Id.

By contrast, in this case, there was no evidence that, when the victim spoke with Platt, she was responding to "direct charges of fault." Id. Rather,

8

the trial court reasonably could have found that the victim's statements were spontaneous, and not deliberate, made under the excitement of the startling event.

The defendant also contends that the victim's statements cannot be excited utterances because she "had a motive to not tell Platt everything that had happened." However, "[t]hat an out-of-court statement is self-serving does not render it inadmissible." Id.

Considering the record, we cannot conclude that the trial court unsustainably exercised its discretion by admitting the victim's pretrial oral statements to Platt as excited utterances. "We will not overturn the superior court's decision on appeal simply because we might have ruled differently." State v. Dedrick, 132 N.H. 218, 226 (1989); see In the Matter of Kurowski & Kurowski, 161 N.H. 578, 600-01 (2011) (explaining that "the fact that the trial court reasonably could have reached a different decision based upon the evidence before it" does not "mean that its decision constitutes an unsustainable exercise of discretion").

### 2. Written Statement

We need not decide whether admission of the victim's written statement was error, because we agree with the State that any such error was harmless. An error is harmless if we can say beyond a reasonable doubt that it did not affect the verdict. State v. Beede, 156 N.H. 102, 109 (2007). The State bears the burden of proving that an error is harmless. Id. The evaluation of whether the State has met its burden involves consideration of the alternative evidence presented at trial and the character of the contested evidence. Id. An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity or weight, and if the contested evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. Id.

In this case, the victim's written statement at the police station was cumulative of her oral statements to Platt. See State v. Clay, 910 N.E.2d 14, 19 (Ohio Ct. App. 2009). The facts of this case are similar to those in Clay. Clay involved a physical altercation between the defendant and his girlfriend, the victim. Id. at 17. After the altercation, the victim left the couple's apartment, went to a grocery store, and called a local city council member. Id. The victim told the city council member that the defendant had kicked her in the face and that she was bleeding. Id. The council member called the police. Id. The police found the victim in the apartment parking lot. Id. The victim was "hysterical, crying, and screaming." Id. The victim told the police that the defendant had kicked her in the face. Id. The police transported the victim to the police station where she signed a short written statement describing the assault. Id. At trial, the victim "distanced herself from her earlier written

9

statement," claiming that she could not remember specific details about the assault.  Id.  She testified that the defendant had tried to pull the phone away from her and that when she pulled back, it hit her in the face, causing a red mark, but not hurting her.  Id.  On direct examination, the prosecution, with the court's approval, submitted the victim's written statement as substantive evidence.  Id. at 18.

On appeal, the defendant argued that the unsworn written statement constituted hearsay and should not have been admitted substantively.  Id.  The appellate court agreed that the statement constituted inadmissible hearsay, but concluded that its admission was not reversible error because it was cumulative of the victim's excited utterances to the police officers at the scene and to the city council member.  Id. at 19.

Similarly, in this case, the victim's written statement to Platt was cumulative of her excited utterances.  Moreover, like the victim's July 9 application for a domestic violence order of protection, the victim's written statement to Platt could have been admitted to impeach the victim's trial testimony as a prior inconsistent statement.  See N.H. R. Ev. 607; see Beltran, 153 N.H. 650-52.  If it had been so admitted, the jury would still have had a strong reason to believe Platt's account of what the victim said.  Under all the circumstances, we hold that any error in the admission of the victim's written statement to Platt as substantive evidence was harmless beyond a reasonable doubt.  See Clay, 910 N.E.2d at 19.

II.  Self-Defense

The defendant next asserts that the trial court erred "in finding sufficient evidence to prove that [he] did not act in self-defense."  At the close of the State's case, the defendant moved to dismiss the simple assault charge on the ground that the State had failed to disprove that he acted in self-defense.  The trial court denied the motion, stating:

> [T]here is a plethora of inconsistent and contradictory statements and it's up to the jury to sort out those statements and determine what weight to give to [them] . . . and what to accept and what to reject, but there is evidence from which a jury could find beyond a reasonable doubt that . . . the Defendant did not act in self-defense.

On appeal, the defendant concedes that there was conflicting evidence regarding whether he acted in self-defense, in that portions of the victim's trial testimony conflicted with what she told Platt on July 9.  However, he argues that "because the differences between [the victim's] testimony and her statements to Platt could support either of two reasonable inferences, including one consistent with self-defense, the evidence failed to disprove that defense."

10

Under RSA 627:4, I (2007), "[a] person is justified in using non-deadly force upon another person in order to defend himself . . . from what he reasonably believes to be the imminent use of unlawful, non-deadly force by such other person, and he may use a degree of force which he reasonably believes to be necessary for such purpose." Force is not justified, however, if the defendant had a "purpose to cause physical harm" and "provoked the use of unlawful, non-deadly force" by the other person, or was the "initial aggressor." RSA 627:4, I. "When evidence of self-defense is admitted, conduct negating the defense becomes an element of the charged offense, which the State must prove beyond a reasonable doubt." State v. Santamaria, 145 N.H. 138, 141 (2000) (quotation, brackets, and emphasis omitted).

To prevail in his challenge to the sufficiency of the evidence negating self-defense, the defendant must establish that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found, beyond a reasonable doubt, that he did not act in self-defense. See State v. Costella, 166 N.H. 705, 709 (2014). In reviewing the evidence, we examine each evidentiary item in the context of all the evidence, not in isolation. State v. Kelley, 159 N.H. 449, 455 (2009). Further, the trier of fact may draw reasonable inferences from facts proved and also inferences from facts found as a result of other inferences, provided they can be reasonably drawn therefrom. Id. Because a challenge to the sufficiency of the evidence raises a claim of legal error, our standard of review is de novo. State v. Collyns, 166 N.H. 514, 517 (2014).

The defendant appears to assert that the victim's testimony at trial and her pretrial statements to Platt constitute "circumstantial" evidence. Thus, he cites the standard we apply when the evidence as to one or more elements of the charged offense is solely circumstantial. See State v. Germain, 165 N.H. 350, 360 (2013) (holding that when the evidence as to one or more of the elements of the charged offense is solely circumstantial, it must exclude all reasonable conclusions except guilt). The victim's testimony and pretrial statements to Platt, however, are direct evidence of what occurred on July 9. Thus, the defendant's reliance upon our "solely circumstantial" test is misplaced.

Here, viewing the evidence and all reasonable inferences from it in the light most favorable to the State, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that the defendant provoked the victim verbally, was the initial aggressor in the altercation, and/or that he used an unreasonable degree of force. A rational trier of fact could have found that, upon returning home, the defendant "became upset with [the victim,] . . . started to yell at her and call her names." A rational trier of fact could also have found that, at one point, while he was yelling and calling the victim names, he put "his hand in her face" and, when she pushed it away, "he then threw her against the wall and . . . wrapped his arm around her neck." A

11

rational trier of fact could also have found that the victim bit him "to get him away from her," and that, when she did so, he "pushed her down onto the ground and . . . wrapped his hand around her neck and applied pressure."

Although there were conflicts between the victim's trial testimony and her pretrial statements to Platt, the jury was free to "accept some parts and reject other parts" of the victim's testimony and to "adopt one or the other of [her] inconsistent statements." State v. Mason, 150 N.H. 53, 56 (2003) (quotations omitted). We cannot say, on the record before us, that it was unreasonable for the jury to resolve the victim's conflicting testimony and pretrial statements to Platt in favor of the State. See State v. McAvenia, 122 N.H. 580, 582 (1982). Nor can we say that no reasonable trier of fact could have found, beyond a reasonable doubt, that the defendant did not act in self-defense. See id. Accordingly, we hold that the trial court did not err by denying the defendant's motion to dismiss the simple assault charge.

III.  Indictment and Sentence

We now address the defendant's appeal of the trial court's denial of his post-trial motion to vacate his sentence and for a new trial. The defendant contends that the State improperly brought the simple assault charge as a class B felony. He contends that the simple assault charge should only have been brought as a class A misdemeanor, and, that therefore, the trial court erred by denying his motion to vacate his sentence and by failing to resentence him.

According to the indictment, the simple assault charge was enhanced because, within six years of the July 9 incident, the defendant had been convicted of violating a domestic violence protective order. See RSA 173-B:9, IV. Before the trial began, outside of the presence of the jury, the defendant stipulated that he had previously been convicted of violating a protective order within six years of the July 9 incident. The defendant specifically acknowledged that, because of the stipulation, if he were to be convicted of the simple assault charge, that charge would be recorded as a class B felony and he would be subject to class B felony penalties.

Approximately eight months after the trial court sentenced him, the defendant moved to vacate the sentence, arguing that the simple assault charge, in fact, constituted a class B misdemeanor, and, therefore, the trial court erred by sentencing him to incarceration and probation. See RSA 651:2, III (2007) (providing that the sentence for a "person convicted of a class B misdemeanor . . . shall not include incarceration or probation"); see also RSA 625:9, IV(b) (2007) (defining a class B misdemeanor as "any crime so designated" and "any crime outside of this code for which the maximum penalty does not include any term of imprisonment"). The defendant asserted that, because the legislature did not classify simple assault as a class A or

12

class B misdemeanor, it is presumed to be a class B misdemeanor. See RSA 625:9, IV(c) (Supp. 2014). Under RSA 625:9, IV(c), the charge would be deemed a class A misdemeanor only if an element of the offense involved "an act of violence" or "threat of violence," or if the State had filed "a notice of intent to seek class A misdemeanor penalties on or before the date of arraignment." Here, the defendant asserted, the charge remained a class B misdemeanor because it did not involve "an act of violence" or "threat of violence," RSA 625:9, IV(c)(1); see State v. Blunt, 164 N.H. 679, 683-84 (2013), and because the State never filed the statutorily-required notice. See RSA 625:9, IV(c)(2). He contended that, because the simple assault charge constituted a class B misdemeanor, the trial court should have sentenced him accordingly, and that it erred by sentencing him to incarceration and probation. See RSA 651:2, III; see also RSA 625:9, IV(b). The trial court concluded that no notice, other than the class B felony indictment itself, was required by statute, and, thus, denied the defendant's motion.

The defendant concedes that his appellate argument differs from his trial court argument. On appeal, he asserts that the trial court erred by failing to reduce his sentence to a class A misdemeanor penalty. He contends that the felony indictment enhanced the simple assault charge from a class B to a class A misdemeanor, but if the State wanted to charge him with a class B felony, it first had to file the notice required by RSA 625:9, IV(c)(2). Because of the differences between his appellate and trial court arguments, the defendant invokes our plain error rule. See Sup. Ct. R. 16-A. Accordingly, we confine our review to plain error.

The plain error rule allows us to consider errors that were not raised in the trial court. State v. Ortiz, 162 N.H. 585, 590 (2011). We apply the rule "sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result." Id. (quotation omitted). To reverse a trial court decision under the plain error rule: "(1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings." Id. (quotation omitted).

We need not decide whether the State erred by charging the defendant with simple assault as a class B felony, and, likewise, whether the trial court erred by imposing a class B felony penalty for that charge because we hold that the second criterion of the plain error rule is not met. Thus, the defendant has failed to demonstrate that the trial court committed plain error by allowing the class B felony indictment and penalty to stand.

"For the purposes of the plain error rule, an error is plain if it was or should have been obvious in the sense that the governing law was clearly settled to the contrary." Id. at 591 (quotation omitted). "When the law is not clear at the time of trial and remains unsettled at the time of appeal, a decision

13

by the trial court cannot be plain error."  Id. (quotation omitted).  "'Plain' as used in the plain error rule is synonymous with clear or, equivalently, obvious."  Id. (quotation omitted).

Here, the trial court's error was neither clear nor unequivocally obvious because this case is one of first impression, id., and because the statutes at issue are not clear on their face as to how they should be construed together "so that they do not contradict each other, and so that they will lead to reasonable results" and effectuate their legislative purpose.  State v. Cheney, 165 N.H. 677, 682 (2013) (quotation omitted).

The two statutes at issue are RSA 173-B:9, IV and RSA 625:9, IV(c).  RSA 173-B:9, IV allows the State to enhance a defendant's subsequent offense "involving abuse" when it occurs "within 6 years" of a conviction "under RSA 173-B:9, III."  Under RSA 173-B:9, IV(c), "[i]f the subsequent offense would otherwise constitute a class A misdemeanor, it may be charged as a class B felony."  Under RSA 173-B:9, IV(d), "[i]f the subsequent offense would otherwise constitute a class B misdemeanor, it may be charged as a class A misdemeanor."  The defendant does not dispute that "he had a qualifying conviction within six years that can serve to enhance a simple assault charge."

RSA 625:9, IV (Supp. 2014) provides that, when a misdemeanor is committed by an individual, it is either a class A or class B misdemeanor.  It also provides that, when, as in the instant case, the Criminal Code does not designate a crime as either a class A or class B misdemeanor, see RSA 631:2-a, it "shall be presumed to be a class B misdemeanor unless:  (1) [a]n element of the offense involves an 'act of violence' or 'threat of violence' . . . ; or (2) [t]he state files a notice of intent to seek class A misdemeanor penalties on or before the date of arraignment."  RSA 625:9, IV(c).

In the trial court, the defendant contended that the two statutes require the State to file the notice described in RSA 625:9, IV(c)(2) whenever it seeks any penalty other than class B misdemeanor penalties for an unclassified misdemeanor.  The lack of notice, the defendant argued, meant that his simple assault charge remained a class B misdemeanor, notwithstanding that the indictment charged simple assault as a class B felony.

On appeal, the defendant posits a different interpretation.  He now argues that, even without the notice described in RSA 625:9, IV(c)(2), the State could obtain class A misdemeanor penalties for the simple assault charge pursuant to RSA 173-B:9, IV.  The defendant asserts that the lack of notice under RSA 625:9, IV(c)(2) meant that, because of RSA 173-B:9, IV, his simple assault charge became a class A misdemeanor, but did not become a class B felony.  He argues that, had the State wanted to elevate the simple assault charge to a class B felony, it was required to issue the notice under RSA 625:9,

IV(c)(2) and to charge him by indictment with simple assault as a class B felony.

The State posits still another interpretation. The State contends that an unclassified misdemeanor may be elevated to a class B felony pursuant to RSA 173-B:9, IV, regardless of whether the State provides the notice described in RSA 625:9, IV(c)(2). To the State, it is unclear from the language of either statute how the legislature intended RSA 173-B:9, IV and RSA 625:9, IV(c)(2) to be construed so that they are "consistent with each other[,] . . . . do not contradict each other, and so that they will lead to reasonable results and effectuate [their] legislative purpose." Cheney, 165 N.H. at 682 (quotation omitted). As the State observes, while RSA 173-B:9, IV expressly precludes the State from elevating an unclassified felony, it is silent with regard to unclassified misdemeanors. See RSA 173-B:9, IV(a). The State interprets this silence as "implying that such offenses should be construed under then-existing law," which allowed an unclassified misdemeanor to be elevated to a class B felony without any notice other than the indictment itself.

Because the State concludes that "RSA 625:9, IV(c) is clearly ambiguous when read in conjunction with RSA 173-B:9, IV(c)," the State examines the legislative history of RSA 625:9, IV(c), observing that the purpose of that provision was "to save money by forcing prosecutors to decide before arraignment . . . whether they would seek . . . jail time, because failure to affirmatively state that decision by filing the [required] notice . . . would mean that the defendant . . . would not be entitled to appointed counsel." That purpose, the State argues, would not be fulfilled if we were to construe RSA 173-B:9, IV and RSA 625:9, IV(c) as allowing the State to elevate unclassified misdemeanors to class A misdemeanors, but not to class B felonies. This is so, the State explains, "[b]ecause defendants charged with either class A misdemeanors or class B felonies are entitled to appointed counsel." Therefore, the State reasons that, consistent with the purpose of RSA 625:9, IV(c), an unclassified misdemeanor may be elevated to a class B felony without the notice set forth in RSA 625:9, IV(c). Such a ruling, the State argues, promotes justice, see RSA 625:3 (2007), and complies not only with the intended purpose of RSA 625:9, IV(c), but also with "the purpose of RSA 173-B:9, which at the time it was passed plainly contemplated that unclassified misdemeanors could be elevated to class B felonies."

Given these varied and, arguably, reasonable interpretations of the interplay between RSA 625:9, IV(c) and RSA 173-B:9, IV, we cannot say that, even if the trial court's statutory interpretation were error, its error was plain. Any error was not "plainly evident" from the statutory language. State v. Henderson, 154 N.H. 95, 98 (2006). Accordingly, we find no plain error here.

15

IV. Motion for a New Trial

Finally, the defendant argues that the trial court erred when it denied his motion for a new trial based upon newly discovered evidence. The defendant's "newly discovered evidence" is the victim's post-trial admission to a friend that she "exaggerated her story" when she spoke with the police about the July 9 incident. The trial court denied the defendant's motion, in part, because it found that the victim's post-trial admission was cumulative of her trial testimony in which she "consistently minimized the nature and seriousness of the defendant's conduct." On appeal, the defendant concedes that the new evidence "was consistent with [the victim's] testimony [at trial] about the event," but contends, nonetheless, that the trial court erred in finding the new evidence cumulative.

To prevail upon a motion for a new trial based upon newly discovered evidence, the defendant must show: (1) that he was not at fault for failing to discover the evidence at the time of his trial; (2) the evidence is admissible, material to the merits, and not cumulative; and (3) the evidence is of such a character that a different result would probably be reached in another trial. State v. Bader, 148 N.H. 265, 282 (2002). "Whether newly discovered evidence requires a new trial is a question of fact for the trial court." State v. Cossette, 151 N.H. 355, 361 (2004). We will sustain the trial court's decision unless it is clearly unreasonable. Id.

We cannot conclude that the trial court's denial of the defendant's motion was "clearly unreasonable." Id. "Cumulative evidence is defined as additional evidence of the same kind to the same point. Evidence which goes to a point upon which no evidence was adduced at the former trial is not cumulative." Bader, 148 N.H. at 282-83 (quotation omitted). Here, as the trial court found, and as the defendant concedes, the victim's post-trial admission that she exaggerated when she told the police about the July 9 incident is consistent with her trial testimony. See id. at 283. As the State explains: "If the jury believed [the victim's trial] testimony, it could only have concluded that [she] had exaggerated . . . the story she told Platt[ ], not a little, but a great deal." Although the victim told Platt that the defendant had thrown "her against the wall," "pushed her down onto the ground," "wrapped his hand around her neck," and "applied pressure," the victim told the jury that none of this was true.

Based upon this record, we conclude that the trial court's finding that the victim's post-trial admission was cumulative of other evidence at trial was not "clearly unreasonable." Cossette, 151 N.H. at 361. Accordingly, we need not address the defendant's arguments regarding the admissibility of the victim's post-trial admission. See Bader, 148 N.H. at 283. Even if the victim's post-trial admission were admissible, its "cumulative nature . . . dictates that

16

the defendant has failed to meet the second prong of the newly discovered evidence test." Id.

Affirmed.

HICKS, CONBOY, LYNN, and BASSETT, JJ., concurred.