Rockingham
No. 99-802

THE STATE OF NEW HAMPSHIRE

v.

STEVEN B. GORDON

Argued: September 19, 2002
Opinion Issued: December 18, 2002

*Philip T. McLaughlin,* attorney general (*Susan P. McGinnis,* attorney, on the brief and orally), for the State.

*David M. Rothstein,* deputy chief appellate defender, of Concord, by brief and orally, for the defendant.

BROCK, C.J. The defendant, Steven B. Gordon, was found guilty by a jury of five counts of aggravated felonious sexual assault, RSA 632-A:2 (Supp. 2002), and two counts of kidnapping, RSA 633:1 (1996) (amended 2001). The Trial Court (*Coffey,* J.) sentenced the defendant to consecutive terms of imprisonment of twenty to forty years on four counts of aggravated felonious sexual assault, a consecutive sentence of life without parole on the fifth count of aggravated felonious sexual assault and consecutive seven and one-half to fifteen year terms on the two counts of kidnapping. We affirm the convictions, vacate the sentences and remand for resentencing.

On July 18, 1998, the two victims, Young and Griffith, left a party in Hampton Beach at around 1:45 a.m. They were walking along the beach when the defendant ordered them into his car at gunpoint. He drove to a

wooded area in Portsmouth and stopped the car. The defendant screamed at the women, ordering them to take their clothes off. The defendant ordered Young at gunpoint to engage in oral sex with Griffith, then forced her to have oral sex with him. He anally raped Young and then vaginally raped Griffith while pointing the gun at Young. He then ordered the women to get out of the car and lay face down on the ground. He told them he would shoot them if they looked at the car or the license plate. The defendant said he would throw their clothes out of the car after he left.

The car drove off, then stopped, and the women heard a man shouting. Afraid the defendant was coming back, they ran in opposite directions. Young hid in some nettles and bushes. After quite a while she decided to get up because the nettles hurt and she was covered with flies. She could hear Griffith calling her over and over but she didn't answer because she was afraid the defendant had captured Griffith and was forcing her to call to lure Young. Eventually, as it was getting light, the women found each other by following the sounds of their voices. Both women were naked, covered with scratches, and lost. They found their way to a house and knocked on the door.

Patricia Stokel, sitting on her porch around 5:30 a.m., heard Young and Griffith crying. The women told her they had been raped and asked that she call the police. When officers from the Portsmouth Police Department arrived, they found Young and Griffith were scratched, bleeding, physically shaken, shocked, and upset. Griffith told the police that a man with a gun had pulled up and ordered them to get in his car.

The women were taken to Portsmouth Regional Hospital where they were interviewed and treated by medical personnel. They were crying and frightened. Griffith refused to let the doctor examine her. She told the physician, Dr. Gilston, they had been abducted and raped at gunpoint. Griffith was given medications to prevent and treat sexually transmitted diseases and to prevent pregnancy. Young also told the doctor that they had been abducted at gunpoint. Young was examined by the doctor who found that she was covered with abrasions and scratches and suffered a fresh, acute tear on her anus. Young was given a tetanus shot, medications to prevent and treat sexually transmitted diseases and an HIV test.

On July 23, 1998, the defendant's probation officer received a collect call from the defendant who was in Belgium. The defendant admitted that he assaulted the victims. On July 20, 1998, the Portsmouth Police Department issued a warrant for the defendant's arrest. An extradition request was sent to Belgium. The defendant was extradited to the United States and arraigned in the Portsmouth District Court on February 24, 1999.

The defendant raises six issues on appeal: (1) whether the trial court erred in imposing a life sentence under RSA 632-A:10-a, III (Supp. 2002);

(2) whether New Hampshire's extradition request to Belgium, which stated that the maximum penalty for aggravated felonious sexual assault was twenty years, precluded the imposition of more severe penalties; (3) whether the trial court should have declared a mistrial after the defendant's probation officer told the jury that the defendant had been stalking people outside a nightclub on the same evening as the charged offenses; (4) whether the trial court erroneously admitted hearsay evidence; (5) whether the State failed to prove the serious bodily injury element of its kidnapping indictments; and (6) whether the trial court erroneously instructed the jury on consent.

*I. Sentencing*

The defendant was convicted of aggravated felonious sexual assault in 1993. At his sentencing in this case, the trial court counted the defendant's 1993 conviction as his first conviction, the convictions for charges involving Griffith as his second conviction and the convictions for charges involving Young as his third conviction. The court then applied the provisions of RSA 632-A:10-a, III and imposed a life sentence without parole. The defendant argues on appeal that the court erred because he only had one previous conviction for aggravated felonious sexual assault within the meaning of the statute.

RSA 632-A:10-a, II (Supp. 2002) provides: "[I]f a court finds that a defendant has been previously convicted under RSA 632-A:2 . . . , the defendant shall be sentenced to a maximum sentence which is not to exceed 40 years and a minimum which is not to exceed ½ of the maximum." Subsection III of the statute provides that "if the court finds that a defendant has been previously convicted of 2 or more offenses under RSA 632-A:2 . . . , the defendant shall be sentenced to life imprisonment and shall not be eligible for parole at any time." The term "previously convicted" is defined as "any conviction obtained by trial on the merits, or negotiated plea with the assistance of counsel and evidencing a knowing, intelligent and voluntary waiver of the defendant's rights, provided, however, that previous imprisonment is not required." RSA 632-A:10-a, IV (Supp. 2002).

At the sentencing hearing the trial court stated:

> The statute calls for "previously convicted." . . . It just simply strains the imagination to believe the legislature's intent in this case would be to allow an individual to rape two or three or more women in one night and call that one conviction. It seems to me quite clear that the series of assaults against one woman constitutes one conviction, and a series of assaults against

another woman constitutes an additional conviction. And I am considering it as such. . . . It doesn't seem to me to make any kind of sense to consider that you can rape two or three or more women in one night and that's not considered a prior conviction. As far as I'm concerned it was previous in time. The convictions came in one right after another. And the conduct does not have to be subsequent to the conviction.

The question on appeal is whether the statutory language "previously convicted of 2 or more offenses" should be construed, as the trial court did, to mean literally any two convictions regardless of whether they were committed "simultaneously during a single spasm of criminal activity," or whether the phrase references the number of prior occasions on which a defendant has engaged in and been convicted of aggravated felonious sexual assault. *United States v. Towne*, 870 F.2d 880, 889 (2d Cir.), *cert. denied*, 490 U.S. 1101 (1989). We have not interpreted the words "previously convicted" in the context of multiple convictions arising out of one criminal transaction. *Cf. State v. Gordon*, 148 N.H. 681, 684 (2002) (term "previously convicted" does not require offenses to follow in chronological order for purposes of sentence enhancement). Among other jurisdictions, there is a "split of authority on this issue, the resolution of which often depends on the language of the particular statute under consideration and the court's opinion of what purpose such a statute is intended to serve." Annotation, *Chronological or Procedural Sequence of Former Convictions as Affecting Enhancement of Penalty Under Habitual Offender Statutes*, 7 A.L.R. 5TH 263, 263 (2001).

When the language of a statute is ambiguous, we look beyond the language to determine the intent of the legislature. *Larose v. Superintendent, Hillsborough County Correction Admin.*, 142 N.H. 364, 366 (1997). We conclude that the statute is ambiguous and therefore turn to its legislative history.

In 1991, the Senate established an *ad hoc* legislative committee charged with reviewing New Hampshire's rape laws. The committee heard extensive testimony during its three-month investigation, both from people "who have been or know someone who has been sexually assaulted, and those who work in or with the criminal justice system." REPORT OF THE JOINT AD HOC COMMITTEE TO REVIEW NEW HAMPSHIRE'S RAPE LAWS at 1 (January 27, 1992) (REPORT). As the REPORT states:

Many who came before the committee had spent a considerable amount of time reviewing the sexual assault statutes over the past two years, and they made several suggested revisions to these statutes which have been incorporated into proposed

legislation. There was much discussion around the issue of sentencing, particularly mandatory minimum sentences. The general consensus was that most individuals convicted of rape do not receive an appropriate sentence. Although it was felt there was a need to increase the length of time in sentencing guidelines, *particularly for repeat offenders*, it was agreed that mandatory minimum sentences for first time convictions would have a detrimental effect.

*Id.* at 3-4 (emphasis added).

The committee drafted proposed legislation, including SB 472, which amended RSA chapter 632-A. As explained in the REPORT, "Senate Bill 472 adds a strongly-worded purpose section and a penalty section to RSA 632-A. The intent is to show the clear consensus of the committee that persons convicted of these crimes should face severe penalties and, in the absence of mitigating factors, should serve at least the minimum sentence provided under the law." *Id.* at 5. The REPORT states that the "committee strongly recommends that the penalties for aggravated felonious sexual assault be raised to 10 to 20 years for the first offense. For a second offense, we propose a mandatory 20 to 40 year sentence and if a defendant has been convicted more than two times, we recommend mandatory life imprisonment without parole." *Id.* at 6. The purpose section of the revised statute states:

[I]t is the policy of this State that sexual assault crimes shall be treated as the heinous crimes of violence that they truly are, and that persons convicted of those crimes shall be sentenced to severe penalties, including the loss of liberty and heavy fines. In furtherance of this policy, it is the intention of the general court that persons convicted of sexual assault crimes, in the absence of truly mitigating factors, serve at least the minimum sentence provided under the law.

Laws 1992, 254:1.

■ We believe this history reflects the legislature's intent that the statute is aimed at repeat offenders. Nothing in the history indicates that a sentence of life imprisonment without parole is intended to apply to individuals who happen to acquire three convictions as a result of a single criminal episode. *See United States v. Montgomery,* 819 F.2d 847, 850 (8th Cir. 1987) (convictions for simultaneous rape of two victims as part of continuous course of conduct constitutes a single conviction for purposes of sentence enhancement).

In addition to the legislative history, the intent of the legislation is "determined by examining the construction of the statute as a whole, and not simply by examining isolated words and phrases therein." *Appeal of Mikell*, 145 N.H. 435, 439 (2000). The subsections of RSA 632-A:10-a enhance the severity of the applicable sentence with each additional conviction. A first conviction requires a sentence of ten to twenty years, a second conviction requires a sentence of twenty to forty years, and a third conviction requires a sentence of mandatory life without parole. RSA 632-A:10-a, I(b)-III. Under the trial court's construction, a defendant who sexually assaulted three victims in one simultaneous criminal episode would receive a sentence of life without parole. This conclusion is not supported by the statutory scheme, considered as a whole.

The State argues that "[u]nder the defendant's interpretation of the statute, a person could commit a series of unrelated sexual assaults over a period of time, finally be indicted on all the charges, consolidate the matters for trial, and only be 'convicted' one time for the purposes of sentencing under RSA 632-A:10-a." The question whether multiple convictions arising from multiple criminal episodes should be treated as separate convictions regardless of the number of judicial proceedings involved is beyond the scope of this case. We leave its resolution for a case which raises the appropriate factual circumstances.

## II. Extradition Treaty

The defendant was extradited from Belgium to stand trial in Rockingham County on charges including five counts of aggravated felonious sexual assault. In the extradition request, the State specified that aggravated felonious sexual assault carried a maximum penalty of twenty years imprisonment. The defendant argues that the State violated the doctrine of specialty contained in the extradition treaty when it obtained penalties of forty years on four counts and life without parole on a fifth count of aggravated felonious sexual assault without first obtaining Belgium's consent. The State argues that the defendant lacks standing to raise a challenge under the doctrine of specialty. Assuming, without deciding, that the defendant has standing, we hold that the trial court did not err. *See State v. Gordon*, 146 N.H. 324, 326 (2001) (assuming defendant has standing, the objections he may raise are limited to those which Belgium might consider to be a breach of the extradition treaty).

"Under the doctrine of specialty, a nation that receives a criminal defendant pursuant to an extradition treaty may try the defendant only for those offenses for which the other nation granted extradition." *United States v. Puentes*, 50 F.3d 1567, 1572 (11th Cir.), *cert. denied*, 516 U.S. 933 (1995). "The doctrine of specialty embodies the principle of international

comity: to protect its own citizens in prosecutions abroad, the United States guarantees that it will honor limitations placed on prosecutions in the United States. Protection of the doctrine of specialty exists only to the extent that the surrendering country wishes." *United States v. Lazarevich*, 147 F.3d 1061, 1063 (9th Cir.) (quotations and citation omitted), *cert. denied*, 525 U.S. 975 (1998). "Extradition treaties are to be construed liberally to effect their purpose, *i.e.*, the surrender of fugitives to be tried for their alleged offenses." *United States v. Wiebe*, 733 F.2d 549, 554 (8th Cir. 1984).

Article 15, section 1(c) of the extradition treaty between the United States and Belgium provides: "A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for . . . an offense for which the executive authority of the Requested State consents to the person's detention, trial, or punishment." TREATY, art. 15, sec. 1(c). The defendant argues that this language means that the requesting State can only punish the person extradited to the extent approved by the requested State. We disagree.

"In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *United States v. Li*, 206 F.3d 56, 62 (1st Cir.) (quotation omitted), *cert. denied*, 531 U.S. 956 (2000). The treaty specifies the documents that must be included in a valid extradition request. One of those documents is "the text of the law describing the punishment for the offense." TREATY, art. 7, sec. 2(d). This requirement allows the requested State, in this case Belgium, to determine whether the offense for which extradition is sought is an extraditable offense. Article 2 of the treaty limits extraditable offenses to those that are "punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." *Id.* art. 2, sec. 1.

"In determining whether an offense is an extraditable offense, the Contracting States: (a) shall consider only the essential elements of the offense punishable under the laws of both states." *Id.* art. 2, sec. 4(a). Once extradition has been approved for an extraditable offense, it must also be granted for lesser offenses and other penalties, even if they do not fulfill the requirement of minimum punishment of a year or more. *Id.* art. 2, sec. 5. Extradition may not be granted for political offenses. *Id.* art. 4. Extradition may also be refused if the offense is punishable by death in this country, but not in Belgium, unless this country agrees not to carry out a death penalty. *Id.* art. 6.

■ These provisions support the conclusion that the purpose of specifying the penalty for aggravated felonious sexual assault is to satisfy

the requirement in the treaty that the *offense* was punishable by more than one year, not that the sentence imposed would be limited to the minimum provided by our State law. The doctrine of specialty places limits on the *offenses* for which a defendant may be prosecuted but not on the sentence imposed, unless it is a sentence of death. *See United States v. Tse*, 135 F.3d 200, 204 (1st Cir. 1998) (doctrine of specialty "requires that a requesting country not prosecute a defendant for *offenses* other than those for which extradition was granted" (emphasis added)); *State v. Gordon*, 146 N.H. at 327.

### III. Probation Officer's Testimony

The defendant's probation officer testified to statements made by the defendant during a telephone call from Belgium. The prosecutor, having the court's permission to lead the witness, asked whether the defendant said "anything else about that night in Portsmouth?" The probation officer answered, "He said prior — prior to the incident in Portsmouth he had been stalking some people outside Matthew's night club." The defendant objected and moved for a mistrial. The court ruled that the answer was non-responsive to the question, not intentional on the part of the State and not grounds for a mistrial. A curative instruction was given by the court. The defendant argues that this testimony was so prejudicial that the trial court had to declare a mistrial.

"To justify a mistrial, prejudicial testimony must be more than inadmissible, it must constitute an irreparable injustice that cannot be cured by jury instructions." *State v. Rogers*, 138 N.H. 503, 505 (1994) (quotation omitted); *see State v. Kerwin*, 144 N.H. 357, 358-59 (2000). Absent an unsustainable exercise of the discretion afforded to the trial court because of its optimal vantage point for measuring prejudicial effect, we will not reverse the trial court's decision to deny a mistrial. *Id.*; *see State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

■ The jury had heard significant evidence prior to the challenged statement by the probation officer. This evidence included that the defendant had abducted and raped at gunpoint the two victims and abandoned them without any clothes, that the victims had been physically harmed and treated at a hospital, that the defendant's rental car was found at the scene, as was the victims' clothing, that the defendant had admitted that he had assaulted the women, and that he had fled the country. Given this evidence, and the curative instruction to the jury immediately following the probation officer's statement, we hold that the defendant did not suffer an irreparable injustice. *See State v. Smart*, 136 N.H. 639, 650

(1993) (it is presumed that jury follows court's instructions), *cert. denied,* 510 U.S. 917 (1993).

## IV. Hearsay

Griffith left the United States not long after the assaults and did not testify at the defendant's trial. At trial, the State introduced statements made by Griffith to the police before she was taken to the hospital through a Portsmouth Police Officer. The court admitted the statements as excited utterances. In addition, the State introduced statements Griffith made to medical personnel at the hospital through the treating physician. The trial court allowed the statements as statements for the purpose of medical diagnosis or treatment. The defendant argues that the trial court erred in admitting these statements.

Hearsay statements are "inadmissible unless they fall within one of the exceptions to the hearsay rule." *State v. Francoeur,* 146 N.H. 83, 86 (2001). We will not reverse a trial court's ruling on the admissibility of evidence absent an unsustainable exercise of discretion. *Id.; see Lambert,* 147 N.H. at 296. The defendant must show that the "court's ruling was clearly untenable or unreasonable to the prejudice of his case." *Lambert,* 147 N.H. at 296 (quotation omitted).

### A. Excited Utterance

The excited utterance exception to the hearsay rule permits the admission of hearsay statements "relating to a startling event or condition made while under the stress and excitement caused by the event or condition." N.H. R. Ev. 803(2).

The police responded to Stokel's house within a few minutes of being summoned. In response to Officer Mansfield's question to tell her what happened, Griffith responded by saying that a man with a gun pulled up and ordered Griffith and Young to get in his car. While the defendant admits that there was not a great deal of time separating the startling event — abduction and rape — and Griffith's statement to the police officer, he argues that because there was ample time for Griffith to reflect on the events, "her statement lacked the spontaneity that is the linchpin of the excited utterance exception."

After reviewing case law and the advisory notes to the hearsay rules, the trial judge stated: "I'm quite convinced that under the circumstances in this case, as the evidence has unfolded, that this is an excited utterance, that these — that these girls did not have the opportunity to contrive or misrepresent .... I am quite convinced that this condition of excitement had temporarily stilled these girls' capacity to reflect at that point in time." We agree with the trial court's ruling.

■ To qualify as an excited utterance, the statement "must be a spontaneous verbal reaction to some startling or shocking event, made at a time when the speaker was still in a state of nervous excitement produced by that event, and before he had time to contrive or misrepresent." *State v. Lesnick*, 141 N.H. 121, 128 (1996). At the point in the trial when the State offered the police officer's testimony, the evidence already presented included details of the terrifying events of the abduction at gunpoint, the rapes at gunpoint of both women, their abandonment in an unfamiliar location without any clothing, and their walk to Stokel's house in search of help. Testimony of Stokel and Officer Mansfield indicated that Griffith and Young were upset, trembling, shaking, and crying. There is no doubt that the events that had taken place that day were "startling or shocking" and that Griffith was still upset by those events at the time she spoke with Officer Mansfield. The trial court's exercise of discretion is sustainable.

### B. Medical Diagnosis

Griffith and Young were taken to Portsmouth Regional Hospital and treated in the emergency room by Dr. Gilston. Dr. Gilston testified that Griffith told him she had been abducted at gunpoint.

New Hampshire Rule of Evidence 803(4) excepts from the hearsay rule

> statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, regardless of to whom the statements are made, or when the statements are made, if the court, in its discretion, affirmatively finds that the proffered statements were made under circumstances indicating their trustworthiness.

N.H. R. Ev. 803(4). In applying Rule 803(4), the trial court considers "the declarant's intent; the subject matter of the statements; and whether there are circumstances indicating the trustworthiness of the statements." *State v. Lowe*, 140 N.H. 271, 273 (1995).

■ The defendant argues that because Griffith did not intend to allow the doctor to examine her, the rationale that such statements are inherently reliable because the declarant has a stake in her accurate diagnosis and treatment was not present. At trial, the defendant objected to the introduction of Doctor Gilston's testimony on the grounds that the doctor's primary purpose in examining Griffith was to gain evidence for the possible criminal case, not for the purposes of medical treatment. The trial court disagreed, stating that "the doctor made it clear in his

testimony that it's a two-phase evaluation. The first is — strictly for medical treatment, and the second is legal for evidence gathering . . . . This — this young lady made it clear she didn't want to go through the rape kit, so she didn't want to go through the legal evidence-gathering purpose, but she was there at the hospital, she was there to be treated." Although Griffith declined a physical examination by the physician as part of the rape kit process, she accepted treatment for sexually transmitted diseases and pregnancy. This supports the conclusion that she made statements to the physician in order to "obtain an accurate diagnosis or proper treatment." *State v. Soldi*, 145 N.H. 571, 576 (2000) (quotation omitted).

*V. Sufficiency of Evidence*

The defendant argues that the State failed to present sufficient evidence that he inflicted serious bodily injury on Griffith and Young in the course of committing the crime of kidnapping. "In an appeal challenging the sufficiency of the evidence, the defendant carries the burden of proving that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found guilt beyond a reasonable doubt." *State v. Dugas*, 147 N.H. 62, 66 (2001) (quotation and brackets omitted). "This burden of a defendant who appeals his conviction is heavy." *State v. LaRose*, 127 N.H. 146, 152 (1985).

Under RSA 633:1, II, "Kidnapping is a class A felony unless the actor voluntarily releases the victim without serious bodily injury and in a safe place prior to trial, in which case it is a class B felony." The phrase "serious bodily injury" is defined as "any harm to the body which causes severe, permanent or protracted loss of or impairment to the health or of the function of any part of the body." RSA 625:11, VI (1996).

"[A] fair reading of 'serious bodily injury' could include within its definition the serious psychological injuries of a rape victim." *State v. Goodwin*, 118 N.H. 862, 868 (1978); *see State v. Wisowaty*, 137 N.H. 298, 307 (1993) (serious bodily injury includes psychological injuries and mental anguish). The trier of fact "may consider mental anguish of a rape victim to determine whether the victim has suffered serious bodily injury." *Goodwin*, 118 N.H. at 868. A victim's fear that the defendant was going to shoot and kill her "during the sexual assault was relevant to whether she suffered psychological harm or mental anguish, and thus was exposed to serious bodily injury, during the incident." *Wisowaty*, 137 N.H. at 306-07.

Having apparently blacked out after entering the defendant's car, Young woke up to the defendant screaming, over and over again, to take her f____ing clothes off. It was dark and the car was surrounded by trees and bushes. Young was scared that the defendant would shoot and rape her. She did what the defendant told her because she thought he was going

to kill her. The defendant held a gun to her head and forced her to watch her friend being raped. Griffith was screaming at Young to do what the defendant asked because he had a gun. Griffith and Young were both crying and begged the defendant not to kill them and to let them go. The defendant ordered them out of the car and told them he would shoot them if they looked at the license plate. The women were then left lying naked face down on the ground. Hearing the defendant shouting, the women thought the defendant was coming back to kill them and they ran in different directions to hide.

Eventually finding each other, Young appeared to be in shock and both women were naked and covered with scratches. More than three hours from the time they were abducted by the defendant, they found Stokel's house and sought help. The women were distraught, upset, embarrassed, trembling, shaking, sitting close together and crying. Griffith felt sick and would not let the emergency room doctor perform a vaginal exam. Young felt sick and wanted to go back to Ireland. Young was found to have a tear on her anus almost an inch long. Concerned she would get AIDS or other diseases, Young took medications and had a blood test. The police detective who was with the women from 7 a.m. until 3 or 4 p.m. testified that they appeared to be in shock and upset the whole time.

■ These facts support a finding that these victims suffered serious mental anguish. We hold that "based upon all the evidence and all reasonable inferences from it, when considered in a light most favorable to the State," the evidence was sufficient to support the jury's finding that the defendant failed to release these victims without serious bodily injury. *Clyde*, 145 N.H. at 389.

*VI. Consent Instruction*

The defendant argues that the trial court's jury instruction on consent was erroneous and that he is entitled to a new trial. After review of the briefs and the record on appeal, we conclude that this argument is without merit and warrants no further discussion. *Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

We hold that the trial court erred in imposing a sentence of life without parole on the fifth count of aggravated felonious sexual assault. Because the life sentence may have been a factor in the court's choice of sentences

on the other offenses, we vacate all of the sentences and remand for resentencing.

*Convictions affirmed; sentences vacated; remanded for resentencing.*

NADEAU, J., concurred; MURPHY, C.J., and SMITH and GALWAY, JJ., superior court justices, specially assigned under RSA 490:3, concurred.