NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Carroll
No. 2018-0029


THE STATE OF NEW HAMPSHIRE

v.

JONATHAN FOLDS

Argued: January 10, 2019
Opinion Issued: August 8, 2019


Gordon J. MacDonald, attorney general (Susan P. McGinnis, senior assistant attorney general, on the brief and orally), for the State.


Thomas Barnard, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.


HANTZ MARCONI, J. The State appeals an order of the Superior Court (Ignatius, J.). The defendant, Jonathan Folds, filed a motion to suppress a firearm and a motion to dismiss two indictments that alleged he violated the armed career criminal statute. See RSA 159:3-a (2014) (amended 2017). The trial court granted both motions. The State argues that the court erred because (1) the firearm's seizure satisfied the requirements of the plain view exception to the warrant requirement, and (2) the armed career criminal statute does not require the defendant's qualifying felony convictions to arise from at least three separate criminal episodes. We affirm the dismissal of the

armed career criminal indictments, reverse the suppression ruling, and remand.

I

The trial court found, or the record establishes, the following facts. In the fall of 2016, Detective Sergeant Scott of the Conway Police Department worked with a "cooperating individual" (CI) to conduct two controlled purchases of narcotics from the defendant. On each occasion, the CI allegedly purchased 50 grams, or "five fingers," of what appeared to be heroin from the defendant, and turned the drugs over to Scott. Both purchases took place at the defendant's residence. The CI reported that the defendant made frequent trips "down south" to obtain heroin, which the defendant then sold out of his residence, and that he typically obtained between 500 and 600 grams of heroin on these trips. Scott and the CI also discussed additional details about the defendant and his residence based on the CI's observations.

Scott applied for a warrant to search the defendant's residence and submitted an affidavit in support thereof. A search warrant was issued to search the defendant's residence for "[h]eroin, any controlled drugs, drug scales, drug packaging material and devices, drug paraphernalia, . . . and firearms," among other items. Although Scott asked for authorization to search for firearms when she applied for the warrant, she later acknowledged at the motions hearing that "there was never any information that led us to believe that there was a firearm in the home." She testified that, although she often asks for firearms in warrant applications, "this isn't a case that we typically would have asked for firearms."

The police executed the warrant on October 11; Detective Sergeant Blodgett helped with the search. The police discovered drugs and money in the defendant's residence. Having already assisted with the search of other rooms, Blodgett began searching a closet, in which he discovered a box. When he looked in the box, he saw a tightly rolled shirt. He could not identify what, if anything, was inside of the shirt. Blodgett then removed the shirt from the box and unfurled it. When he did so, a firearm fell out of the shirt and onto the floor. Blodgett picked up the firearm and removed its ammunition. The firearm was then marked as evidence and secured.

Based on the discovery of the firearm, the defendant was charged with violating RSA 159:3-a, the armed career criminal statute, as well as RSA 159:3 (2014), which prohibits persons with certain types of felony convictions from owning, possessing, or controlling deadly weapons. He moved to dismiss the armed career criminal charges, arguing that his prior felonies were insufficient as a matter of law to satisfy the requirements of RSA 159:3-a. He also moved to suppress the firearm, arguing that the warrant "was unsupported by probable cause as to that object."

2

The State objected to both motions.  With respect to the firearm, the State conceded that the search warrant affidavit did not establish probable cause to search for firearms.  Nevertheless, the State argued that the firearm's seizure was justified by the plain view exception to the warrant requirement because it was discovered while conducting a lawful search for drugs pursuant to the warrant, and its incriminating nature was immediately apparent at the time it was seized.

After a hearing, the trial court granted both of the defendant's motions.  On the motion to dismiss, the court ruled that the armed career criminal statute requires that the defendant's qualifying convictions stem from three separate criminal episodes.  Because the court concluded that the qualifying convictions alleged in the armed career criminal indictments arose from only two criminal episodes, the court dismissed those indictments.  On the motion to suppress, the trial court agreed that "there was no probable cause for firearms to be included in the search warrant," and thus the firearm's seizure could not be justified by the warrant itself.  The court concluded that, although there was "no dispute that the search of the residence for drugs was lawful," the State had not demonstrated that the firearm's seizure was lawful pursuant to the plain view exception.  The trial court denied the State's subsequent motions for reconsideration, and the State brought this appeal.

II

We begin with the suppression issue.  When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous.  State v. Gay, 169 N.H. 232, 240 (2016).  Our review of the trial court's legal conclusions, however, is de novo.  Id.  We first address the parties' arguments under the State Constitution and rely upon federal law only to aid our analysis.  State v. Ball, 124 N.H. 226, 231-33 (1983).

"Part I, Article 19 of our State Constitution protects all people, their papers, their possessions and their homes from unreasonable searches and seizures."  State v. Schulz, 164 N.H. 217, 221 (2012) (quotation omitted); see N.H. CONST. pt. I, art. 19.  Warrantless seizures are per se unreasonable under Part I, Article 19 unless they fall within the narrow confines of a judicially crafted exception.  State v. Nieves, 160 N.H. 245, 247 (2010).  The State bears the burden of proving by a preponderance of the evidence that a warrantless seizure falls within a recognized exception, such as the plain view exception.  Id.

On appeal, the State argues that the trial court erred in its application of the plain view doctrine.  Generally speaking, the plain view exception "permits a law enforcement officer to seize clearly incriminating evidence or contraband without a warrant, if such evidence is inadvertently discovered during lawful

3

police activity." Ball, 124 N.H. at 234. In order for the seizure of this firearm to be justified under the plain view exception, the State must demonstrate that the officer did not violate the constitution in arriving at the place from which he viewed the firearm. See State v. Cora, 170 N.H. 186, 191 (2017); see also Nieves, 160 N.H. at 247, 251 (explaining that the initial intrusion which afforded the view of the item must have been lawful, meaning the intrusion must have been justified by a warrant or an exception to the warrant requirement). The State must also demonstrate that the officer had a lawful right of access to the firearm itself. See Cora, 170 N.H. at 191. Finally, the State must show that the incriminating nature of the firearm was immediately apparent. See id. Because the item at issue is a weapon, the State is not required to demonstrate that its discovery was inadvertent. See Nieves, 160 N.H. at 250.

The State contends that Blodgett did not violate the constitution in arriving at the place from which he viewed the firearm because Blodgett could permissibly search "the closet, the box, and the rolled up T-shirt" for drugs pursuant to the warrant, since they "were all places where drugs . . . could have been found." We assume, as did the trial court, that the search of the residence for drugs pursuant to the warrant was lawful.[1] "It is well accepted that '[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.'" United States v. Giannetta, 909 F.2d 571, 577 (1st Cir. 1990) (quoting United States v. Ross, 456 U.S. 798, 820-21 (1982)). "Any container may be searched if it is reasonable to believe that the container could conceal the object of the search." Id. As the trial court noted, "heroin can be packaged in baggies as small as a thumbnail." Since it was reasonable to believe that the closet, the box, and the rolled-up shirt could conceal heroin, we agree with the State that Blodgett did not violate the constitution in arriving at the place from which he viewed the firearm. See id.; United States v. Evans, 966 F.2d 398, 400 (8th Cir. 1992) ("The search warrant . . . authorized the police to seize . . . drugs and drug paraphernalia, either of which could have been stored in a box in a closet. The police were, therefore, acting within the scope of the warrant when they opened the box . . . .").

For similar reasons, we conclude that Blodgett had a lawful right of access to the firearm. The difference between the requirement that the officer not have violated the constitution in arriving at the place from which the object

---

[1] The trial court understood that the parties were not disputing that the search of the defendant's residence for drugs was lawful. To the extent the defendant challenges on appeal the lawfulness of the search of his residence for drugs, we note that the issue before the trial court, as framed by the parties, was whether the firearm was permissibly seized pursuant to the plain view exception during a lawful search of the defendant's residence for drugs. Although the defendant argues on appeal that the warrant itself was invalid, we confine our review of the trial court's ruling to the issues it was asked to consider.

was viewed, and the lawful right of access requirement, is that "the former refers to where the officer stands when she sees the item, and the latter to where she must be to retrieve the item." Boone v. Spurgess, 385 F.3d 923, 928 (6th Cir. 2004). The lawful right of access requirement asks whether the officer could permissibly enter or be present in the place from which he or she retrieved the item. See Cora, 170 N.H. at 191; see also United States v Jones, 187 F.3d 210, 221 n.10 (1st Cir. 1999). In the search warrant context, "[a]n executing officer has a lawful right of access to the object seized if the terms of the warrant entitle him to search where the object is found." Com. v. D'Amour, 704 N.E.2d 1166, 1173 (Mass. 1999). Here, the police were lawfully searching the defendant's residence for drugs pursuant to a warrant, and Blodgett discovered the firearm while he was searching in a place where drugs could reasonably have been found. Thus, Blodgett had a lawful right of access to the firearm. See United States v. Wells, 98 F.3d 808, 809-10 (4th Cir. 1996) (officers had a lawful right of access to weapon discovered while conducting lawful search of residence for evidence of bank fraud pursuant to warrant); see also United States v. Naugle, 997 F.2d 819, 823 (10th Cir. 1993).

We next address the immediately apparent requirement. The purpose of this requirement is to prevent general, exploratory rummaging in a person's belongings. State v. Murray, 134 N.H. 613, 615 (1991). The immediately apparent requirement is met if, at the time of the seizure, the officer has probable cause to believe that the object seized is incriminating evidence. State v. Davis, 149 N.H. 698, 701 (2003); accord Ball, 124 N.H. at 235 ("[B]efore an item in plain view may be seized, the law enforcement official must have probable cause to believe the item is contraband or incriminating evidence."). Seizure on mere suspicion is not enough. Ball, 124 N.H. at 235. While the presence or absence of probable cause is determined by reference to an objective standard, id., the officer's expertise and experience are relevant to the probable cause determination, Davis, 149 N.H. at 701. Officers are entitled to draw reasonable inferences from the facts available to them in light of their knowledge and prior experience. Id. at 701-02.

The trial court found that the State had not demonstrated that the incriminating nature of the firearm was immediately apparent because Blodgett did not know the shirt contained a firearm before he unfurled it. On appeal, the State argues that the incriminating nature of the firearm need only have been immediately apparent after the firearm fell out of the shirt, not before Blodgett unfurled the shirt. We agree with the State. The immediately apparent requirement asks whether the item's incriminating nature was evident "at the time of the seizure." Id. at 701 (quotation omitted); accord State v. Bell, 164 N.H. 452, 455-56 (2012); Murray, 134 N.H. at 615. The firearm was not seized for purposes of the plain view doctrine until after it fell out of the shirt, i.e., after it came into plain view. See Cora, 170 N.H. at 191 (noting that "the item must be in plain view" for plain view doctrine to justify its seizure). Assuming without deciding that the firearm was seized when Blodgett

picked it up off of the floor and removed its ammunition, we conclude that there was probable cause to believe that the firearm was incriminating evidence by this point.

The trial court noted that Blodgett had been assigned to the Attorney General's Drug Task Force since 2010, and that he has "extensive training and experience in drug investigations . . . and drug searches." Prior to the warrant's execution, Blodgett attended a briefing that included an overview of the defendant, the information that led the police to apply for a search warrant, and the warrant itself. Included in the information that led Scott to apply for the warrant were the two controlled buys from the defendant and the recovery of several "fingers" of what Scott suspected to be heroin from those buys. "Because of the close relationship between drugs and firearms in the narcotics trade, the plain view seizure of firearms as evidence of narcotics offenses has been" generally upheld by courts "even when firearms are not specifically named in the search warrant." United States v. Simpson, 10 F.3d 645, 647 (9th Cir. 1993) (citation omitted), vacated in part on other grounds, 55 F.3d 420 (9th Cir. 1995); see United States v. Caggiano, 899 F.2d 99, 103-04 (1st Cir. 1990) (noting the clear "evidentiary significance" of firearms when discovered while searching for drugs). Furthermore, the police had already found drugs and a large amount of cash in the defendant's residence by the time Blodgett discovered the gun. See United States v. Matthews, 942 F.2d 779, 783 (10th Cir. 1991) (upholding seizure of weapons discovered while executing search warrant for drugs under plain view exception, given "the weapons' accessibility and proximity to illegal drugs"). Although not every firearm the police may come across is inherently incriminating, we conclude that, on the facts of this case, which include the firearm's close proximity to illegal drugs and the defendant's suspected drug offenses, Blodgett had probable cause to believe the firearm was incriminating evidence before he picked it up from the floor.

On appeal, the defendant appears to contend that the State's arguments pertaining to the firearm's suppression are not properly before us. His argument, as we understand it, is that because the trial court concluded that the portion of the search warrant which authorized the police to search for firearms was not supported by probable cause, the warrant was invalid, and its issuance and execution were unconstitutional. He submits that "the court correctly ruled that unfurling the t-shirt violated the constitution" because "[t]he police executed th[e] warrant by, among other things, unfurling the t-shirt." The defendant seems to suggest that application of the severance doctrine is the only way for the State to avoid suppression of the firearm in these circumstances. See State v. Tucker, 133 N.H. 204, 207-10 (1990). Because the State did not invoke the severance doctrine, the defendant asserts that the State cannot avoid the firearm's suppression.

6

Both the Fourth Amendment to the Federal Constitution as well as Part I, Article 19 of the State Constitution require that search warrants be supported by probable cause.  See Schulz, 164 N.H. at 221, 223; State v. Kellenbeck, 124 N.H. 760, 764 (1984).  Search warrants must also describe the objects of the search with sufficient particularity.  See Tucker, 133 N.H. at 206.  Under the severance doctrine, however, evidence seized pursuant to a partially invalid warrant need not inexorably be suppressed.  See id. at 209-10.  In Tucker, we held that insufficiently particularized clauses in a warrant are severable from the warrant's otherwise specific directives in some circumstances.  See id.  Tucker, however, did not concern the requirement that warrants be supported by probable cause; thus we had no occasion in Tucker to address when, or if, portions of a warrant that are not supported by probable cause can be severed from those that are.  See id. at 205-10.

Ultimately, we need not decide how the severance doctrine bears on this case.  The record of the trial court proceedings shows that both parties took the position — and the court agreed — that there was no probable cause to include the word "firearms" in the search warrant.  The record also shows, however, that the parties did not contest that, despite this probable cause deficiency as to firearms, the police could validly search the defendant's residence for drugs pursuant to the warrant.  Based on the arguments presented to it by the parties, the trial court understood there to be "no dispute" that the search of the residence for drugs pursuant to the warrant was lawful.  It conducted its plain view analysis on the basis of this mutual understanding.  Thus, the defendant has not persuaded us that we cannot review the trial court's plain view ruling as the issue has been developed and presented to us.  Cf. State v. Canelo, 139 N.H. 376, 383 (1995).

In conclusion, we hold that the firearm's seizure was justified by the plain view exception.  Because the State Constitution provides the defendant with at least as much protection as the Federal Constitution under these circumstances, see Nieves, 160 N.H. at 250; Horton v. California, 496 U.S. 128, 130, 136-37 (1990), we reach the same result under the Federal Constitution as we do under the State Constitution.

III

We turn now to RSA 159:3-a, the armed career criminal statute.  The issue in this case is whether that statute applies only when the defendant's qualifying convictions stem from three or more criminal episodes, or if it also applies when the defendant's convictions arise from one or two episodes of criminal activity.

The interpretation of a statute is a question of law, which we review de novo.  State v. Lathrop, 164 N.H. 468, 469 (2012).  This court is the final arbiter of the intent of the legislature as expressed in the words of the statute

7

considered as a whole. State v. Allain, 171 N.H. 286, 287 (2018). We construe the armed career criminal statute according to the fair import of its terms and to promote justice. See In re Justin D., 144 N.H. 450, 452-53 (1999); RSA 625:3, :7 (2016). Our goal is to apply statutes in light of the legislature's intent in enacting them and in light of the policy sought to be advanced by the entire statutory scheme. Lathrop, 164 N.H. at 469. When interpreting a statute, we look first to the language of the statute itself, and, if possible, construe the language according to its plain and ordinary meaning. Allain, 171 N.H. at 288. We do not read words or phrases in isolation, but in the context of the entire statutory scheme. Id. When the language of a statute is ambiguous, we review legislative history to aid our analysis. Lathrop, 164 N.H. at 470.

At the time that the search warrant was executed, RSA 159:3-a, I, provided:

> No person who has been convicted of any combination of 3 or more felonies in this state or any other state under homicide, assault, sexual assault, arson, burglary, robbery, extortion, child pornography, or controlled drug laws, shall own or have in his possession or under his control, a pistol, revolver, rifle, shotgun, or any other firearm.

RSA 159:3-a, I (2014) (amended 2017). The defendant was charged with two violations of this statute. One indictment alleged he violated RSA 159:3-a, I, by having "in his possession or under his control" the firearm that Blodgett discovered while executing the search warrant. The other indictment alleged he violated the statute by "own[ing]" that same firearm. Both indictments alleged the same underlying felony convictions: one burglary conviction that stemmed from an unlawful entry into a residence on May 1, 2015, and three convictions for drug offenses that arose from a search of the defendant's residence and person on October 11, 2012.

The trial court found, and the State does not dispute on appeal, that the three drug convictions arose from a single criminal episode. The trial court interpreted RSA 159:3-a as requiring the defendant's qualifying convictions to arise from three or more criminal episodes. Because the court concluded that the qualifying convictions alleged in the armed career criminal indictments arose from only two criminal episodes, the court granted the defendant's motion to dismiss the indictments.

On appeal, the State argues that RSA 159:3-a does not require the defendant's qualifying convictions to arise from three or more criminal episodes. In the State's view, the statute applies even if all of the defendant's qualifying convictions arise from a single episode of criminal activity. The State asserts that the trial court's interpretation runs counter to the statute's plain language because the statute provides that any combination of felonies may be

counted.  The State further argues that we should not resort to legislative history to aid our construction of the statute, as the statute is not ambiguous.  In the alternative, the State appears to contend that legislative history supports its interpretation.  By contrast, the defendant argues that the trial court correctly interpreted the statute.

We considered a similar statute in State v. Gordon, 148 N.H. 710 (2002).  In Gordon, the statute at issue, RSA 632-A:10-a, III (2016), set forth a sentencing enhancement for persons convicted of aggravated felonious sexual assault (AFSA) who had been "'previously convicted of 2 or more offenses under RSA 632-A:2,'" the AFSA statute.  Gordon, 148 N.H. at 713 (quoting RSA 632-A:10-a, III); see RSA 632-A:2 (Supp. 2018).  The issue before us was whether the statutory language "previously convicted of 2 or more offenses" meant the enhancement applied regardless of whether the defendant's prior AFSA convictions arose from the same criminal episode, or whether the phrase referenced the number of criminal episodes from which the prior convictions arose.  See Gordon, 148 N.H. at 714.  We found the statute ambiguous on this issue, and looked to legislative history to aid our interpretation.  Id.  Our examination of that history revealed that the statute was "aimed at repeat offenders."  Id. at 715.  Further, "[n]othing in the history indicate[d] that [the sentencing enhancement was] intended to apply to individuals who happen to acquire three convictions as a result of a single criminal episode."  Id.  In light of the legislature's intent to target repeat offenders, as well as the statutory scheme as a whole, we held that the sentencing enhancement did not apply to persons whose prior convictions arose from a single criminal episode.  See id. at 715-16; see also Petition of State of N.H., 152 N.H. 185, 188 (2005) (explaining that, in Gordon, we held that "several AFSAs arising out of the same criminal episode would be treated as one conviction under the enhancement statute").

The State argues that Gordon is not on point.  Relying on the phrase "any combination" as used in RSA 159:3-a, which does not appear in RSA 632-A:10-a, III, the State contends that we should follow the Michigan Supreme Court's decision in People v. Gardner, 753 N.W.2d 78 (Mich. 2008).  The statute at issue in Gardner provided that "if a person has been convicted of any combination of 2 or more felonies or attempts to commit felonies . . . and that person commits a subsequent felony within this state," the person must be sentenced under Michigan's habitual offender laws.  Gardner, 753 N.W.2d at 85 (quotation and brackets omitted).  In interpreting this language, the Michigan Supreme Court stated:

> The text clearly contemplates the number of times a person has been "convicted" of "felonies or attempts to commit felonies."  Nothing in the statutory text suggests that the felony convictions must have arisen from separate incidents.  To the contrary, the statutory language defies the importation of a same-incident test

9

> because it states that <u>any combination</u> of convictions must be
> counted.

<u>Id</u>. From <u>Gardner</u>, the State argues that RSA 159:3-a's plain language directs us to count the defendant's total number of convictions for enumerated felonies, rather than the number of criminal episodes from which those convictions arose.

The defendant counters that the significance the State attaches to the "any combination" language is misplaced. He points out that RSA 159:3-a, I, lists several categories of qualifying felonies, namely, "homicide, assault, sexual assault, arson, burglary, robbery, extortion, child pornography, or controlled drug laws." RSA 159:3-a, I (2014) (amended 2017). If the statute was shorn of the phrase "any combination," the defendant argues, it could reasonably be construed to apply only when the defendant's underlying felonies all fall within the same category; for example, only if they are all drug crimes. The legislature's inclusion of the phrase "any combination," then, clarifies that the statute applies regardless of which "combination" of categories a person's felony convictions fall under.

Both constructions are reasonable. The State construes the statute in a strictly literal manner, which is arguably more faithful to the statute's plain text. <u>See</u> <u>United States v. Towne</u>, 870 F.2d 880, 890 (2d Cir. 1989) (noting that the plain language of the Federal Armed Career Criminal Act "arguably support[ed]" the trial court's "literal construction" of it as requiring the court to count the defendant's total number of convictions). However, "[w]e do not strictly construe criminal statutes, but rather construe them according to the fair import of their terms and to promote justice." <u>State v. Paige</u>, 170 N.H. 261, 264 (2017) (quotation omitted). Furthermore, we have previously declined to adopt "strictly literal interpretation[s]" of statutes that "would produce . . . illogical results that the legislature could not have intended." <u>Id</u>. at 265; <u>see also</u> <u>Towne</u>, 870 F.2d at 890 (declining to adopt the trial court's "literal construction" of the Federal Armed Career Criminal Act because doing so "would thwart the clear legislative goals underlying the [Act]"); <u>State v. Chrisicos</u>, 159 N.H. 405, 408 (2009) (noting that "we will reject a literal construction of a statute if it does violence to the apparent policy of the Legislature" (quotation and brackets omitted)). In light of the apparent intent of the armed career criminal statute, namely, to target <u>career</u> criminals, we are skeptical that the legislature sought to sweep within the statute's scope persons who happen to acquire multiple convictions as a result of a single criminal episode. <u>See</u> <u>Gordon</u>, 148 N.H. at 715.

Because both the State's and the defendant's respective constructions of the armed career criminal statute are reasonable, we conclude that the statute is ambiguous. <u>See</u> <u>State v. Costella</u>, 166 N.H. 705, 710 (2014); <u>Union Leader Corp. v. N.H. Retirement Sys.</u>, 162 N.H. 673, 677 (2011). In comparable cases,

we have consulted legislative history to aid in our interpretation of a statute that was similarly ambiguous and which presented a question akin to the one we face here. See Gordon, 148 N.H. at 714-15 (looking to legislative history to discern whether RSA 632-A:10-a, III applied to defendants with multiple convictions arising from a single criminal episode); State v. Melvin, 150 N.H. 134, 136, 138-39 (2003) (looking to legislative history to determine whether multiple convictions arising from multiple criminal episodes should be treated as separate convictions for purposes of RSA 632-A:10-a, III, regardless of number of judicial proceedings in which the convictions were entered). Other courts have done the same. See, e.g., Commonwealth v. Garvey, 76 N.E.3d 987, 990-91 (Mass. 2017) (finding statutory language "previously twice convicted" ambiguous as to "whether the necessary two prior convictions must relate to different criminal incidents" (quotation omitted)); United States v. Herbert, 860 F.2d 620, 622 (5th Cir. 1988) ("Because the term 'three previous convictions' is ambiguous, it is necessary to refer to the legislative history to determine whether the [Federal Armed Career Criminal Act] was intended to apply to defendants who have multiple convictions based on one judicial proceeding but separate criminal transactions."). Accordingly, because the statute is ambiguous, we turn to legislative history. See Costella, 166 N.H. at 710; Gordon, 148 N.H. at 714.

The legislative history of RSA 159:3-a, entitled "Armed Career Criminals," reveals what its title suggests: that it is aimed at persons who repeatedly commit crimes. The statute was enacted in 1989 as a result of House Bill (HB) 699-FN. Laws 1989, ch. 295. The bill was entitled "an act prohibiting the possession of firearms by career criminals and imposing a minimum mandatory sentence." Id. (emphasis added) (capitalization omitted). Throughout the testimony before both the House and Senate Judiciary Committees, repeat offenders were emphasized. See Hearing on HB 699-FN Before the House Judiciary Comm. 1 (February 21, 1989); Hearing on HB 699-FN Before the Sen. Judiciary Comm. 1-2 (April 25, 1989). The House Judiciary Committee reported to the House of Representatives that the act applied "when a person who has been convicted three or more times has firearms in his control. Such persons are considered as armed career criminals and shall be sentenced to a minimum mandatory term of 10 years." N.H.H.R. Jour. 543 (1989) (emphasis added).

This legislative history demonstrates that the legislature's purpose in enacting the armed career criminal statute was to target repeat offenders, not "individuals who happen to acquire three convictions as a result of a single criminal episode." Gordon, 148 N.H. at 715. Interpreting RSA 159:3-a to require each underlying conviction to arise from a separate criminal episode would effectuate that purpose by limiting the statute's application to "career" criminals. See Paige, 170 N.H. at 264 (when interpreting a statute, we aim to effectuate its overall purpose); see also Cynthia L. Sletto, Annotation, Chronological or Procedural Sequence of Former Convictions as Affecting Enhancement of Penalty Under Habitual Offender Statutes, 7 A.L.R.5th 263, 293 (1992) ("[C]ourts

imposing the separate transaction requirement have reasoned that the legislative histories of the pertinent statutes . . . support the conclusion that the statutes are targeted at persistent or repeat offenders, thus mandating that each conviction result from a separate criminal episode.").

In addition, the legislative history supports the defendant's interpretation of the "any combination" language used in the statute. As originally introduced, the bill prohibited any "person who has been convicted 3 or more times . . . of a felony offense under a homicide, assault, sexual assault, burglary, robbery, child pornography, or controlled drug law" from owning, possessing, or controlling a firearm. House Bill 699-FN (1989) (emphasis added). The House Judiciary Committee recommended that the bill be amended to include arson and extortion among the crimes listed. See N.H.H.R. Jour. 543-44 (1989). The committee also recommended replacing the "convicted 3 or more times" language in the proposed bill with the "convicted of any combination of 3 or more felonies" language that was ultimately enacted. Compare House Bill 699-FN (1989), with N.H.H.R. Jour. 544 (1989), and Laws 1989, 295:1. The latter change was intended "to include persons convicted of any combination of crimes as listed." Hearing on HB 699-FN Before Subcomm. of the House Judiciary Comm. (March 9, 1989) (emphasis added). The committee reported its changes to the House as follows: "The bill was amended to include arson and extortion in a list of felonies to be considered when a person who has been convicted three or more times has firearms in his control." N.H.H.R. Jour. 543 (1989) (emphasis added). This history demonstrates, as the defendant suggests, that the legislature included the phrase "any combination of" to clarify that the statute applied to defendants regardless of which "combination" of categories, "as listed," the defendant's felony convictions fell under. Where legislative history "plainly supports a particular construction of the statute, we will adopt that construction, since our task in interpreting statutes is to determine legislative intent." Union Leader Corp., 162 N.H. at 678 (quotation omitted).

Additionally, testimony before the House Judiciary Committee indicates that HB 699-FN was modeled after federal law. See Hearing on HB 699-FN Before the House Judiciary Comm. 1 (February 21, 1989). The Federal Armed Career Criminal Act is presently codified at 18 U.S.C. § 924(e) (2012). See Mathis v. United States, 136 S. Ct. 2243, 2247 (2016). It imposes a mandatory minimum sentence of fifteen years upon any "person who violates [18 U.S.C. §] 922(g)," if that person "has three previous convictions . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e)(1). The phrase "committed on occasions different from one another" was added to the federal statute in November 1988. See Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7056, 102 Stat. 4181, 4402. HB 699-FN was introduced in the New Hampshire Legislature in January 1989, less than three months after the federal statute was amended. Compare id., with N.H.H.R. Jour. 110 (1989).

The State argues that New Hampshire's armed career criminal statute materially differs from its federal analogue because it does not include the phrase "committed on occasions different from one another." Prior to the federal statute's 1988 amendment, however, it was "fairly well-established" among federal courts that the statute's "reference to '<u>convictions</u>' pertains to single 'episodes' of felonious criminal activity that are distinct in time, rather than literal convictions." <u>Towne</u>, 870 F.2d at 889 (emphasis added). Therefore, the significance the State attaches to the New Hampshire Legislature's omission of the phrase "committed on occasions different from one another," as that phrase is used in the federal statute, is misplaced. Even without this language, the federal statute upon which RSA 159:3-a was modeled required that the defendant's convictions stem from at least three criminal episodes. <u>See</u> <u>id</u>. at 889-90; <u>United States v. Blackwood</u>, 913 F.2d 139, 146 (4th Cir. 1990). The 1988 language was added to the federal statute only to confirm that Congress had intended the statute to be construed in this manner, and to avoid further litigation on the issue. <u>See</u> 134 Cong. Rec. S17360, S17370 (daily ed. Nov. 10, 1988) (statement of Sen. Biden); <u>see also</u> <u>Gardner</u>, 753 N.W.2d at 99 (Cavanagh, J., dissenting) (explaining that "Congress relied on the court rulings" regarding the statute's meaning based on its legislative history in amending the statute to expressly reflect that meaning). The 1988 statute was neither intended to change, nor did it change, the substance of the statute. <u>See</u> <u>United States v. McElyea</u>, 158 F.3d 1016, 1019-20 (9th Cir. 1998) (explaining that the 1988 amendment's purpose was "to reflect the Solicitor General's construction" of the statute articulated in the government's brief before the United States Supreme Court in <u>Petty v. United States</u>, 481 U.S. 1034 (1987) (quotation omitted)); <u>Towne</u>, 870 F.2d at 890 ("The Solicitor General's brief [in <u>Petty</u>] canvassed the statute's legislative history and attempted to demonstrate that Congress had intended its sentencing enhancement provision to apply only to recidivists and repeat offenders, and not to persons who commit several crimes at one time.").

In conclusion, we hold that RSA 159:3-a applies only to persons whose qualifying convictions arise from three or more criminal episodes. It would not be consistent with the legislature's intent, as we have discerned it, to interpret the statute otherwise. Therefore, we affirm the trial court's dismissal of the armed career criminal indictments.

<u>Affirmed in part; reversed in part; and remanded</u>.

LYNN, C.J., and HICKS, BASSETT, and DONOVAN, JJ., concurred.